COMMONWEALTH OF PENNSYLVA-
NIA, Attorney General of the Common-
wealth of Pennsylvania, City of Phila-
delphia, and Alan Levi Bond, by his
mother, Mrs. Ruby Bond, Charles Wil-
liam Hicks and Theodore Lewis Hicks,
by their mother, Mrs. Marie Hicks,
James Scruggs and Henry Scruggs, by
their mother, Mrs. Ardella Scruggs, and
Tyrone Karl White and Terry Sherwood
White, by their mother, Mrs. Charlotte
L. White, on behalf of themselves and
all others similarly situated, Plaintiffs,

v.

Revelle W. BROWN et al., Trustees of the
Estate of Stephen Girard, Defendants.

Civ. A. No. 39404.

United States District Court
E. D. Pennsylvania.

Sept. 2, 1966.

William T. Coleman, Jr., of Dilworth, Paxson, Kalish, Kohn & Dilks, Drinker, Biddle & Reath, by Charles J. Biddle, Cuthbert H. Latta, J. Alan Kugle, Special Counsel, Philadelphia, Pa., for Commonwealth of Pennsylvania, Attorney General of Commonwealth of Pennsylvania, and individual plaintiffs.

Morgan, Lewis & Bockius, by Arthur Littleton, John Russell, Jr., Ernest R. vonStarck, Richard P. Brown, Jr., of Morgan, Lewis & Bockius, Thomas J. Gaffney, of Gaffney & Gaffney, Philadelphia, Pa., for defendants.

Edward G. Bauer, Jr., City Sol., Matthew W. Bullock, Jr., Deputy City Sol., Philadelphia, Pa., for City of Philadelphia.

Harrison Kildare, of Rawle & Henderson, Philadelphia, Pa., William D. Valente, Villanova, Pa., Jerome J. Shestack, of Schnader, Harrison, Segal & Lewis, Murray H. Shusterman, Leon I. Mesirov, Philadelphia, Pa., for Philadelphia Fellowship Commission, American Civil Liberties Union, Greater Philadelphia Branch, Jewish Community Relations Council of Greater Philadelphia, Greater Philadelphia Council of Churches, Philadelphia Urban League and Friends Committee on Race Relations, Dominic P. Toscani, Philadelphia, Pa., amici curae parties.

## OPINION

JOSEPH S. LORD, III, District Judge.

This is an action brought by the Commonwealth of Pennsylvania, the Attorney General of the Commonwealth, the City of Philadelphia, and seven minor Negro male orphans, by their guardians. The individual plaintiffs sue in behalf of themselves and all others similarly sit-

uated. The defendants are the trustees of the Girard Estate. They are charged with the duty of administering Girard College, a charitable educational establishment created under the will of Stephen Girard.

The complaint alleges that the defendants have refused to admit the individual plaintiffs to Girard College solely because of their race. The relief prayed is an injunction to prohibit defendants' continued refusal to admit the minor plaintiffs and other applicants merely because they are Negroes, and such additional relief as might be necessary.

The complaint consists of three counts and seeks relief from the alleged violation of, respectively, (1) the Constitution of the United States, and particularly the equal protection clause of the Fourteenth Amendment; (2) the testamentary intent of the settlor, Stephen Girard, in the context of previous actions of the trustees and present-day circumstances; and (3) the statutes and public policy of Pennsylvania precluding the denial of admission solely on the basis of a racial criterion.

The defendants have moved to dismiss the complaint for (1) lack of jurisdiction over the subject matter, due to the asserted absence of a substantial federal question presented by the first count of the complaint and diversity or pendent jurisdiction over the second and third counts; (2) res judicata, by reason of a final order of the Orphans' Court of Philadelphia County;[1] (3) failure to state a claim upon which relief can be granted; and (4) lack of standing to sue on the part of the Commonwealth, the Attorney General and the City.

## I. THE COMPLAINT

For the purpose of deciding a motion to dismiss pursuant to Rule 12 of the Federal Rules of Civil Procedure, the well-pleaded allegations of the complaint must be assumed to be true. Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); United States v. Shubert, 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 279 (1955); Clark v. Uebersee Finanz-Korporation, 332 U.S. 480, 68 S.Ct. 174, 92 L.Ed. 88 (1947); Polk Co. v. Glover, 305 U.S. 5, 59 S.Ct. 15, 83 L.Ed. 6 (1938); Rogers v. American Can Co., 305 F.2d 297, 318 (C.A.3, 1962). On this motion, plaintiffs must also be given the benefit of all the inferences which may fairly be drawn from the complaint. Melo-Sonics Corp. v. Cropp, 342 F.2d 856 (C.A.3, 1965); Valle v. Stengel, 176 F.2d 697 (C.A.3, 1949). See also F.R.Civ.P. 8(f). The sufficiency of the complaint must be considered within the framework of these well-established rules.

The complaint alleges that Girard College, a school for boys between six and eighteen years of age, was constructed in 1848 pursuant to a trust established under the will of Stephen Girard, who died in 1831. Girard left the principal part of his estate to the "Mayor, Aldermen and citizens of Philadelphia their successors and assigns in trust" for the creation and administration of the school, the construction and improvement of certain streets in the City of Philadelphia, neighborhood improvement in the vicinity of the Delaware River and the demolition of the wooden buildings in the city. He left $2,000,000 of the residue of the estate in trust for the College, and substantially the rest for the

1. Girard Estate, 7 Pa.Fiduc.Rptr. 555 (Orph.Ct.Phila.Co., 1957), rehearing denied, 7 Pa.Fiduc.Rptr. 608 (Orph.Ct.Phila. Co., 1957), aff'd sub nom. Girard College Trusteeship, 391 Pa. 434, 138 A.2d 844 (1958), appeal dismissed and cert. denied sub nom. Commonwealth of Pennsylvania v. Board of Directors of City Trusts, 357 U.S. 570, 78 S.Ct. 1383, 2 L.Ed.2d 1546 (1958), rehearing denied, 358 U.S. 858, 79 S.Ct. 14, 3 L.Ed.2d 92 (1958).

For prior proceedings, see Girard Estate, 4 Pa.Dist. & Co.R.2d 671 (Phila. Orph.Ct.1955), aff'd on rehearing, 4 Pa. Dist. & Co.R.2d 708 (Phila.Orph.Ct.1956), aff'd sub nom. Girard Will Case, 386 Pa. 548, 127 A.2d 287 (1956), rev'd sub nom. Commonwealth of Pennsylvania v. Board of Directors of City Trusts, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957), rehearing denied, 353 U.S. 989, 77 S.Ct. 1281, 1 L.Ed.2d 1146 (1957).

maintenance of a more adequate police force, the improvement of city property and the appearance of the city.

In 1832, the city accepted the trust by the passage of an ordinance, and administered the College until 1959. The Board of City Trusts consistently refused to admit those applicants for admission to the College whom they deemed not to be "white." This practice, engaged in by an instrumentality of the state, was held by the Supreme Court of the United States to constitute governmental discrimination in violation of the Fourteenth Amendment. Commonwealth of Pennsylvania v. Board of Directors of City Trusts, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1958). Thereafter, on remand from the Supreme Court of Pennsylvania, the Orphans' Court of Philadelphia County, without notice or opportunity for the parties to be heard, removed the Board of City Trusts as trustee and appointed private persons. This action was found by the Supreme Court of Pennsylvania to be inconsistent with neither the mandate of the United States Supreme Court nor the Fourteenth Amendment nor the will of Stephen Girard. Girard College Trusteeship, 391 Pa. 434, 138 A.2d 844 (1958), appeal dismissed and cert. denied sub nom. Commonwealth of Pennsylvania v. Board of Directors of City Trusts, 357 U.S. 570, 78 S.Ct. 1383, 2 L.Ed.2d 1546 (1958). The policy of discrimination by race has been carried on by the substituted trustees since they took office.

Girard's will (a copy of which is attached to the complaint) recited in paragraph XX that he was "particularly desirous to provide for such a number of poor male white orphan children, as can be trained in one institution, a better education as well as a more comfort-

able maintenance than they usually receive from the application of public funds." Pursuant to that aim, Girard provided in paragraph XXI (3) that "[a]s many poor white male orphans, between the ages of six and ten years, as said income shall be adequate to maintain, shall be introduced into the college as soon as possible; and from time to time as there may be vacancies, or as increased ability from income may warrant, others shall be introduced." He specified that if there were "more applicants than vacancies, and the applying orphans shall have been born in different places, a preference shall be given,— first to orphans born in the city of Philadelphia," and then to those born in other enumerated areas of the country. Will, ¶ XXI(6).

The complaint alleges that each individual plaintiff is a poor male orphan (father deceased) [2] between the age of six and ten, was born in Philadelphia, and would be eligible for admission to Girard College except that defendants deem him not to be white. The ultimate question, therefore, is the validity of the racial exclusion. The complaint attacks it from numerous angles. The several grounds for relief, which are asserted either by explicit statement or by fair inference from the complaint, follow.

### (a) COUNT I

The first count relies principally on alleged violations of the Fourteenth Amendment of the United States Constitution.[3] It alleges that the public policies in force in 1830 induced Stephen Girard to discriminate, as these public policies themselves did, against Negroes. This continuing discrimination, if private, is viewed nevertheless as having emanated from earlier state and federal policies especially hospitable to it, which

---

2. See Soohan v. City of Philadelphia, 33 Pa. 9 (1859).

3. Section 1 of Amendment 14 reads as follows: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein

they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." .

created an environment perhaps unreceptive to anything else. More direct governmental assistance is also averred. It is said that Girard College "is so impressed with state involvement and state action" that its acts must be imputed to the state itself, and the College must accordingly comply with the Fourteenth Amendment.

The state action alleged in the first count includes both laws of general application which have benefitted the College and the passage of numerous statutes, ordinances and resolutions designed to effectuate the terms of the will and accommodate the law of Pennsylvania and of Philadelphia to its implementation. In the former category are the waiver of the rule against perpetuities, immunity from tort liability, and exemption from taxation. In the latter are the acts enabling the city to accept and perform the trust duties, denying the city the power to place a road through the property, authorizing the construction of a boundary road around it, providing the College library with a set of the Colonial Records, and creating a Select Committee of the House of Representatives on the Estate of Stephen Girard to oversee the College's operation and receive the annual reports which Girard's will required the trustees to submit to the legislature.

It is alleged that municipal management of the estate for longer than a century resulted in a more than fifteen-fold increase in the amount of the trust corpus, because of the provision of administrative services without charge by the city's personnel, as well as the various pecuniary exemptions in which the estate shares with charitable trusts generally. This, plaintiffs say, is a permanent benefit conferred by the public which cannot be dissipated.

It is also contended that the state courts have contributed to the discrimination by failing to correct harmful and racially-motivated deviations by the trustees from the terms of the will and by appointing, *sua sponte,* substitute trustees to adminster the College when

city administration was found to violate the Constitution.

The first count thus alleges that Girard himself irretrievably entangled the city and state governments in the administration of the College, that they obligingly became enmeshed, that they have, wittingly and unwittingly, fostered racial discrimination in its operation and, finally, that education is in any event an inherently public function, to which the strictures of the Fourteenth Amendment attach.

### (b) COUNT II

The second count asks for the application of the doctrine of *cy pres* to fulfill Girard's alleged intentions to benefit the City of Philadelphia and eradicate poverty. Plaintiffs allege changes in the condition of the city and the College which in their view would warrant a judicially-decreed deviation from the literal terms of the will to effectuate its less literal purposes. The complaint states that at the time of Girard's death the proportion of Negro to white inhabitants of Philadelphia was less than one to eight, whereas the present ratio is more than one to four. In Girard's time, poverty and ignorance were widespread among the white population, while now they are far greater among the Negro population. Girard College can best fulfill its functions, it is averred, by the admission of poor male orphans without regard to race.

Count two also contains another line of approach. The College is alleged to be able to accommodate 2,000 boys. It presently serves only 700. Capacity, therefore, exceeds enrollment. Notwithstanding the large number of vacancies, the trustees are charged with having deviated from the terms of the will arbitrarily and discriminatorily. They have, according to the complaint, been faced with a dearth of applications from poor white children within Philadelphia and have resorted to accepting, in derogation of the will provisions, boys who are not "poor" but, on the contrary, "come from families of considerable means." Likewise, they have sought and

admitted large numbers of students who were not born in and do not reside in Philadelphia. If circumstances demand deviations from the will, the plaintiffs maintain that, as a matter of proper construction, the deviations may not be motivated by caprice or racial malice. The plaintiffs argue that if the requirement of poverty and the preference to Philadelphians may partially be dispensed with, then so must the requisite of whiteness, at least to the same extent.

### (c) COUNT III

The third count alleges that denial of admission to applicants for Girard College solely because of their race is violative of the Pennsylvania Public Accommodations Act. Act of May 19, 1887, P.L. 130, § 1, as amended, 18 P.S. § 4654. This statute makes it a misdemeanor to refuse, withhold from, or deny to "any person on account of race, creed, or color" the "full and equal accommodations, advantages, facilities and privileges of any places of public accommodation, resort or amusement, subject only to the conditions and limitations established by law and applicable alike to all persons." Places of public accommodation include, among other facilities, "kindergartens, primary and secondary schools, high schools, academies, colleges and universities, extension courses, and all educational institutions under the supervision of this Commonwealth · * *." Excepted from the application of the statute is "any institution, club or place or places of public accommodation, resort or amusement, which is or are in its or their nature distinctly private * * *."

Count three contains allegations designed to establish that Girard College is an educational institution under the supervision of the Commonwealth in the same manner as all other schools and even beyond, since, as a charity, it is subject to the visitation of the Commonwealth through its Attorney General. The continued enforcement of racial restrictions by those responsible for operating such a school would, it is main-

tained, contravene the statute and the public policy of Pennsylvania.

### II. JURISDICTION

■ The threshold question is jurisdiction. The jurisdiction of the federal district court must appear from the face of the complaint, F.R.Civ.P. 8(a), and the court must be satisfied before it proceeds that jurisdiction exists. Clark v. Paul Gray, Inc., 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001 (1939).

The complaint bases jurisdiction on a number of statutory provisions:

(1) 28 U.S.C. § 1331(a), which gives district courts "original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States";

(2) Civil Rights Act of 1870, § 16, 42 U.S.C. § 1981, which insures that all "persons within the jurisdiction of the United States shall have the same right * * * to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens," and the Civil Rights Act of 1871, § 1, 42 U.S.C. § 1983, which renders liable to the person injured, in suits at law and in equity, any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws * * *;" and

(3) 28 U.S.C. § 1343, which confers jurisdiction on the district courts over "any civil action authorized by law to be commenced by any person * * * (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege, or immunity secured by the Constitution of the United States or any Act of Congress providing for equal rights of citizens or of all per-

sons within the jurisdiction of the United States"

In order for jurisdiction to lie under the first of these three provisions, there must be both a substantial federal question and the requisite amount. See Fuller v. Volk, 351 F.2d 323 (C.A.3, 1965). We are not obliged, however, to determine whether federal question jurisdiction has been properly invoked in the present case, compare Hague v. C. I. O., 307 U.S. 496, 530, 59 S.Ct. 954, 83 L.Ed. 1423 (Stone, J., concurring), because jurisdiction does exist under section 1343(3) of Title 28 and section 1983 of Title 42. See Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943); WRIGHT, FEDERAL COURTS § 32, at pp. 92–93 (1963). The complaint sufficiently raises substantial questions of whether the defendants are, "under color of" state authority, depriving the individual plaintiffs of their right to the equal protection of the laws.

Where the question of jurisdiction is so intimately tied to the merits as it is here, the frequent practice has been to assume jurisdiction tentatively and defer final ruling on juridiction until decision on the merits of the federal claim. Campbell v. Glenwood Hills Hosp., 224 F.Supp. 27, 29 (D.Minn., 1963). In the instant case, decision on the ultimate merits of the federal question has, for the present, been rendered unnecessary. Nonetheless, if those claims are without substance, we have no jurisdiction to decide the state law claims in counts two and three. United Mine Workers of America v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Rogers v. Provident Hosp., 241 F.Supp. 633, 639 (N.D.Ill., 1965). But if the federal claims are substantial, even though ultimately insufficient on their merits, Baker v. Carr, 369 U.S. 186, 199, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); cf. Wheeldin v. Wheeler, 373 U.S. 647, 649, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963); Bell v. Hood, 327 U.S. 678, 682–684, 66 S.Ct. 773, 90 L.Ed. 939 (1948) (both under § 1331), we have original jurisdiction over the federal claims, and jurisdiction, if any, over the state law claims would be pendent jurisdiction. We must therefore examine *in limine*, not the ultimate merits, but the substantiality of the federal questions involved in count one.

If Girard College is indeed an instrumentality of the Commonwealth of Pennsylvania or the City of Philadelphia, its discrimination in the selection of students by race would be forbidden by the Fourteenth Amendment. Commonwealth of Pennsylvania v. Board of Directors of City Trusts, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957). Racial discrimination is as much prohibited where the state involvement is covert as it is where it is blatant. Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed. 2d 5, 19 (1958). While "private conduct abridging individual rights does no violence to the Equal Protection Clause unless to some significant extent the State in any of its manifestations has been found to have become involved in it", nevertheless state involvement is not insignificant merely because it is "non-obvious." Burton v. Wilmington Parking Auth., 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). The "central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States." McLaughlin v. Florida, 379 U.S. 184, 192, 85 S.Ct. 283, 288, 13 L.Ed.2d 222 (1964).

Some of the constitutional questions presented by this complaint are on the frontier of the Fourteenth Amendment, but their substantiality cannot be gainsaid for that. It is certainly not clear whether, after more than a century of municipal administration, the sustaining cord from the city to the College has been cut by the substitution of trustees. The initial relationship was willed by Girard himself, and it is arguable that whatever benefits it may have brought persist.

Recently, in Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966), the Supreme Court dealt with

similar issues. A park had been devised to the City of Macon, Georgia, to be used for whites only. The city eventually desegregated the park, and thereafter the members of the park Board of Managers, serving under the will, brought suit to ask that private trustees be substituted, presumably with the object of resegregation in mind. The city resigned as trustee, and the state court appointed new trustees. On certiorari, the Supreme Court reversed, holding that "where the tradition of municipal control ha[s] become firmly established," the transfer of title to the private trustees did not disentangle "the park from segregation under the municipal regime that long controlled it." 382 U.S. at 301, 302, 86 S.Ct. at 489, 490.

The Court assumed from the pleadings in *Evans* that the park had been maintained as a public facility, "as well as granted tax exemption * * *." Id. at 301, 86 S.Ct. at 489. What weight it accorded the latter factor is unclear. Whether the enjoyment of the benefits of tax exemption, immunity from tort liability and waiver of the rule against perpetuities—which accrue alike to all charitable trusts, whatever their policies —would be enough to make the state responsible for the trustees' discriminatory conduct has not yet been authoritatively decided. Cf. Eaton v. Grubbs, 329 F.2d 710 (C.A.4, 1964).

In *Evans* it was also suggested that a city park, public or private, is "municipal in nature." 382 U.S. at 301, 86 S.Ct. 486. *Evans* could therefore be assimilated to the cases holding constitutional limitations applicable to organizations performing irretrievably public functions. See Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); Public Util. Comm'n v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). It is true that *Terry, Pollak* and *Marsh* involved monopoly positions (white primary, public

transportation and company town, respectively), and a private school existing side-by-side with a city school system may be distinguishable. In *Evans* the case of a testator who "wanted to leave a school or center for the use of one race only and in no way implicated the State in the supervision, control, or management of the facility" was distinguished as arguably involving "no constitutional difficulty." 382 U.S. at 300, 86 S.Ct. at 489. But the state *was* involved in Girard College and plaintiffs maintain that Girard has such a "firmly established" tradition of municipal control that it must remain subject to the restraints of the Fourteenth Amendment; or perhaps, irrespective of the tradition, that the College, which opened on a racially-exclusive basis in 1848, is part of the residue of state-encouraged segregation which it was the purpose of the Civil War Amendments to obliterate. Cf. Robinson v. Florida, 378 U.S. 153, 156–157, 84 S.Ct. 1693, 12 L.Ed.2d 771 (1964); Peterson v. City of Greenville, 373 U.S. 244, 248, 83 S.Ct. 1119, 10 L.Ed. 2d 323 (1963).

Plaintiffs also argue that the unsolicited action of the Orphans' Court in choosing the mode of implementing the Supreme Court's mandate was itself a form of affirmative state action.[4] Compare Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953); Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). On the assumption that the mandate could have been fulfilled by either a change of admission policy or a change of trustee, plaintiffs contend, in effect, that the Orphans' Court, in deciding to perpetuate the restrictive admissions criteria of the will, unconstitutionally converted a public into a private school. Compare Griffin v. County School Bd., 377 U.S. 218, 231, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964). In *Evans* it was said: "We may fairly assume that had the Georgia courts been of the view that even in

4. In Evans v. Newton, the lawsuit had been begun by the trustees, who were seeking their own replacement; here, by

contrast, there was no resignation by the trustee.

private hands the park may not be operated for the public on a segregated basis, the resignation would not have been accepted and private trustees appointed," 382 U.S. at 302, 86 S.Ct. at 490, and, to be sure, the Pennsylvania courts were also aware that replacement of the trustees would mean continued exclusion of Negroes from the school, see, e. g., Girard College Trusteeship, 391 Pa. 434, 455, 138 A.2d 844 (1958). The defendants' response to the charge of judicial state action is that the will, not the courts, compelled the substitution. Cf. Black v. Cutter Labs., 351 U.S. 292, 76 S.Ct. 824, 100 L.Ed. 1188 (1956).[5] Thus, this case presents important questions regarding the ultimate reach of the *Shelley* principle.

What has been said so far suffices to demonstrate the substantiality of the controversy over the alleged deprivation of federal rights. If such denials have in fact occurred, clearly they were committed "under color of law." Under color of law means under state authority or pretense of it. Cf. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941). The complaint here does not allege that Girard College maintains any open or purported connection with the state. Save for the alleged judicial action, the state action, if any, is "nonobvious." This distinction is quite immaterial. Cf. Turner v. City of Memphis, 369 U.S. 350, 82 S.Ct. 805, 7 L.Ed. 2d 762 (1962); Smith v. Holiday Inns of America, Inc., 336 F.2d 630 (C.A.6, 1964); Eaton v. Grubbs, 329 F.2d 710 (C.A.4, 1964), all brought under section 1343 and all involving nonobvious governmental action. If state action is established, color of law must follow, lest there be an incentive to discreet dis-

crimination. "In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." United States v. Price, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267 (1966).

■ We have so far put to one side the possible defense of res judicata. To adjudicate the merits of that defense requires jurisdiction. All the discussion to this point merely shows the seriousness of the constitutional questions present in this case. Certainly it could not be said that plaintiffs' federal claims are "unsubstantial and frivolous." Baker v. Carr, 369 U.S. 186, 199, 82 S.Ct. 691, 700, 7 L.Ed.2d 663 (1962). Since "no further consideration of the merits of the claim is relevant to a determination of the court's jurisdiction of the subject matter", ibid., we find that this court has jurisdiction over the subject matter of count one of the complaint.

■ In the absence of diversity of citizenship among the parties, jurisdiction over counts two and three, which rest on state law, must be pendent jurisdiction. Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); Osborn v. Bank of United States, 9 Wheat. (22 U.S.) 738, 823, 6 L.Ed. 204 (1824). In United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed. 218 (1966), the Supreme Court clarified the characteristics required for the state claims in a complaint to be considered pendent to the federal claim. The relationship between the state and federal claims must permit "the conclusion that the entire action before the court comprises but one constitutional 'case.' The federal claim must have substance sufficient to confer subject matter jurisdiction on the

---

5. The complaint states that departures from the strict terms of other wills have been regularly allowed by the Orphans' Court in comparable circumstances. Cf. Barr v. City of Columbia, 378 U.S. 146, 149–150, 84 S.Ct. 1734, 12 L.Ed.2d 766 (1964); NAACP v. Alabama ex rel. Flowers, 377 U.S. 288, 296–301, 84 S.Ct.

1302, 12 L.Ed.2d 325 (1964); Wright v. Georgia, 373 U.S. 284, 291, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963); NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 456–458, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Staub v. City of Baxley, 355 U.S. 313, 318–320, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958).

court. * * * The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard for their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole.

"That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals." Id. at 725–727, 86 S.Ct. at 1138.

 In terms of these standards, the present case is an appropriate one for the exercise of pendent jurisdiction. The three counts of the complaint constitute a single "case" for a single trial. Their "common nucleus of operative fact" is the operation of Girard College on a racially-exclusive basis and the consequent denial of admission to the individual plaintiff-applicants. The defendants point to the different elements of proof necessary to support each of the alternative grounds on which the plaintiffs rely. But that is true in every lawsuit involving a claim arising under more than one law unless the governing principles happen by coincidence to be coterminous. From the standpoint of administration, the considerations which militate against a multiplicity of actions over the same subject matter indicate the exercise of pendent jurisdiction here.

Moreover, it cannot be said that the state issues predominate in this lawsuit. The proof required on the several counts is overlapping, the constitutional issues are at least as significant as the state law questions, and the relief sought is unitary and identical. The state claims are by no means the "real body of [the] case, to which the federal claim is only an appendage". United Mine Workers of America v. Gibbs, supra at 727, 86 S.Ct. at 1140.

 Further, in at least one respect there may be a federal constitutional question lurking in the background of one of the state claims. In count two plaintiffs ask for a construction of the will's admission requirements in the light of alleged deviations from them by the trustees. If this claim were proved and a court declined arbitrarily to order the trustees to make a further departure, a question of invidious official discrimination might arise. In suggesting this, we do not prejudge either the state or federal issues. It is, however, of the first importance to recognize that a total compartmentalization of the counts into state and federal pigeonholes is difficult to effect. Here, as in *Gibbs*, "the state claim is so closely tied to questions of federal policy that the argument for exercise of pendent jurisdiction is particularly strong." 383 U.S. at 727, 86 S.Ct. at 1139. Consequently, federal jurisdiction having properly been invoked, it ought to extend to the entire lawsuit. This course is permissible even though it may be that only state law matters are ultimately decided. Township of Hills-

borough, Somerset County, N. J. v. Cromwell, 326 U.S. 620, 66 S.Ct. 445, 90 L.Ed. 358 (1946); Siler v. Louisville & N. R. R., 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909); cf. United Mine Workers of America v. Gibbs, supra, 383 U.S. at 728, 86 S.Ct. 1130.

That very possibility is an additional reason for assuming pendent jurisdiction over the state law claims. "The Court" and, *a fortiori,* lower courts, "will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., dissenting in part). If counts two and three were dismissed for want of jurisdiction, the only claims left to adjudicate would involve unsettled constitutional questions. Without any assurance that a suit based on counts two and three would be brought in the state courts, dismissal of them in this court might well force a premature constitutional adjudication. On the other hand, assumption of pendent jurisdiction would leave the state claims here, with the further possibility, discussed hereafter, of abstention by this court as to those claims. Thus, by taking jurisdiction, there are two alternatives: (1) the state questions can be determined by this court; or (2) this court can abstain and leave the determination of state questions to the state courts. Either course may eliminate the necessity of reaching the constitutional questions. Since "pendent jurisdiction is a doctrine of discretion," United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), we are convinced that efficient and proper disposition of this lawsuit compels the conclusion that counts two and three are pendent to count one of the complaint.

The defendants have also attacked the jurisdiction of this court to consider plaintiffs' claims under the will. The objection is two-fold. First, defendants contend that the nature of the individual plaintiffs' claims is such as to require the court to have control over the trust estate before it can adjudicate rights under count two. Secondly, defendants argue that the federal courts lack power to *cy pres* a trust. These arguments are unconvincing. If jurisdiction otherwise exists, the federal courts may entertain actions to construe wills. Colton v. Colton, 127 U.S. 300, 8 S.Ct. 1164, 32 L.Ed. 138 (1888). An exception in the interest of comity is made where the action is in rem and the property is in the control of a state court. Princess Lida of Thurn and Taxis v. Thompson, 305 U.S. 456, 59 S.Ct. 275, 83 L.Ed. 285 (1939). *Princess Lida* involved a quasi-in rem proceeding, the subject of which was the administration and restoration of corpus. It was held that in such a case state court jurisdiction, first acquired, was exclusive. It was, however, made clear that the federal courts possess concurrent jurisdiction where the suit is not to "marshal assets, administer trusts, or liquidate estates, and in suits of a similar nature when, to give effect to its jurisdiction, the court must control the property", but is instead to determine "the right of any person to participate in the res or * * * the quantum of his interest in it." Id. at 466, 467, 59 S.Ct. at 280. The doctrine of exclusive jurisdiction,

"necessary to the harmonious operation of federal and state tribunals. * * * has no application to a case in federal court based upon diversity of citizenship [here pendent jurisdiction], wherein the plaintiff seeks merely an adjudication of his right or his interest as a basis of a claim against a fund in the possession of a state court * * *." 305 U.S. at 466–467, 59 S.Ct. at 281.

If circumstances made it necessary to apply the trust property to new uses or "to award the fund to an eleemosynary institution whose services will most nearly approximate the intention of the donor", Womens' Homeopathic Hosp. of Phidadelphia Case, 393 Pa. 313, 318, 142 A.2d 292, 294, (1958), perhaps possession

would be important, although in Pennsylvania the *cy pres* power is given to any orphans' court or court having equity jurisdiction in the proper county. Id. at 317, 142 A.2d 292. Cf. Foster v. Carlin, 200 F.2d 943, 947 (C.A. 4, 1952). Challenged here, however, is not the application of the estate's funds to the school, but the standards for admission to it. No pecuniary diversion is requested, only a modification of policy. The same relief is asked in count two as is prayed in counts one and three, but the defendants do not even remotely hint that if a violation of a federal constitutional or state statutory provision were found, a court would need control over the res to enjoin it. As was said in *Princess Lida,* "an action in the federal court to establish the validity or the amount of a claim constitutes no interference with a state court's possession or control of a res." 305 U.S. at 467, 59 S.Ct. at 281. See also Markham v. Allen, 326 U.S. 490, 66 S.Ct. 296, 90 L.Ed. 256 (1946); Waterman v. Canal-Louisiana Bank & Trust Co., 215 U.S. 33, 30 S.Ct. 10, 54 L.Ed. 80 (1909).

 Defendants' other argument is that *cy pres* is a prerogative power which, originating in the Crown, is denied to the federal courts as being "non-judicial" in the contemplation of Article III of the Constitution. This view, however, ignores the long-standing distinction between prerogative and judicial *cy pres.* While prerogative *cy pres* in England permitted diversions of the fund to purposes other than those contemplated by the settlor, see 4 Scott, Trusts, § 399.1 (2d ed. 1956), judicial *cy pres* involves an effectuation of the general charitable intent. Judicial *cy pres* is part of the "regular and inherent jurisdiction [of] a court of equity in relation to trusts * * *." Fontain v. Ravenel, 17 How. (58 U.S.) 369, 397, 15 L.Ed. 80 (1855) (Daniel, J., concurring). If count two were to state a valid *cy pres* claim—and on that we presently intimate no view— this court would have jurisdiction to grant relief. Cf. Fontain v. Ravenel, supra; Vidal v. Girard's Executors, 2 How. (43 U.S.) 127, 11 L.Ed. 205 (1844);

Smith v. Moore, 343 F.2d 594 (C.A. 4, 1965).

## III. STANDING OF THE GOVERNMENTAL PLAINTIFFS

The trustees have moved to dismiss this action insofar as the Commonwealth, the Attorney General and the City of Philadelphia are parties plaintiff. Their position is that the governmental plaintiffs have an insufficient interest in the claims presented in count one of the complaint, and also should be denied standing to sue in the federal court to secure what in defendants' view would be the collateral review of previous state court decisions regarding Girard College. No challenge is made to the standing of the individual plaintiffs.

 The first objection goes only to the standing to bring the federal claims of count one. Standing to litigate them is a federal question. Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed. 2d 663 (1962). It is claimed that the governmental plaintiffs have only an official and not a direct personal interest in the outcome of this litigation. Ordinarily, an official interest is not enough to give rise to an adequately adversary proceeding. County Court of Braxton County v. West Virginia ex rel. Dillon, 208 U.S. 192, 28 S.Ct. 275, 52 L.Ed. 450 (1908); Smith v. Indiana ex rel. Lewis, 191 U.S. 138, 24 S.Ct. 51, 48 L.Ed. 125 (1903). It has consistently been held that "the interest of a state official in vindicating the Constitution of the United States gives him no legal standing" in the federal courts "to attack the constitutionality of a state statute in order to avoid compliance with it." Coleman v. Miller, 307 U.S. 433, 466, 59 S.Ct. 972, 987, 83 L.Ed. 1385 (1939) (separate opinion of Frankfurter, J.).

 Under Pennsylvania law, the Commonwealth and its Attorney General have the duty, as *parens patriae,* to oversee the operation of charitable trusts. Commonwealth v. Barnes Foundation, 398 Pa. 458, 159 A.2d 500 (1960). It is a duty deriving from the nature of charitable trusts, which may lack beneficiaries

with interests definite enough to enable them to sue for themselves. Nevil Estate, 414 Pa. 122, 199 A.2d 419 (1964); Pruner Estate, 390 Pa. 529, 136 A.2d 107 (1957). The representation thus serves a void-filling function, compare NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 458–459, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), and the Attorney General is an indispensable party to all proceedings involving charitable trusts. Garrison Estate, 391 Pa. 234, 137 A.2d 321 (1958); Pruner Estate, supra.

The Attorney General, then, is not here contesting a practice the constitutionality of which is a matter of indifference to him; on the contrary, his office requires him to scrutinize it. The rule precluding official standing to attack a statute the officer is enforcing cannot be turned around to defeat the standing of an officer whose very obligation is to supervise and challenge. Compare Heckman v. United States, 224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820 (1912); see also Ervien v. United States, 251 U.S. 41, 40 S.Ct. 75, 64 L.Ed. 128 (1919); United States v. American Bell Tel. Co., 128 U.S. 315, 9 S.Ct. 90, 32 L.Ed. 450 (1888).

■ The state law of standing is not conclusive. Doremus v. Board of Educ., 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952). But to test the adequacy of the interest it is necessary to look at the nature of the officer's function, and that derives in this instance from state law. Cf. HART & WECHSLER, THE FEDERAL COURTS AND THE FEDERAL SYSTEM 162–63, 165–66 (1953). Since there is true adversity, the Attorney General is a proper party plaintiff with respect to count one.

The Commonwealth's position is also sufficient to sustain its standing to sue. The education of their citizens "is perhaps the most important function of state and local governments." Brown v. Board of Educ., 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). Assuming for the moment, as we must, that count one states a valid claim under the Fourteenth Amendment, the defendants are impeding the effective fulfillment of that basic function by the Commonwelath, cf. Brewer v. Hoxie School Dist., 238 F.2d 91 (C. A. 8, 1956);[6] hindering it in the performance of its obligation to alleviate state-sponsored discrimination, Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed. 2d 5, 19 (1958); and unlawfully limiting the opportunities of its people (whom it represents as *parens patriae*), State of Georgia v. Pennsylvania R. R., 324 U.S. 439, 451, 65 S.Ct. 716, 89 L.Ed. 1051 (1945). Although "a State is without standing to maintain suit for injuries sustained by its citizens and inhabitants for which they may sue in their own behalf", id. at 473, 65 S.Ct. at 733 (dissenting opinion), a state has a sufficient interest in the elimination of discrimination for which it would be responsible to enable it to maintain an action in federal court.[7]

It is not necessary to decide whether these considerations extend also to the City of Philadelphia, for its standing may be rested on a more narrow ground. The city does not sue merely as a municipal corporation to protect its citizens. It is the named trustee under the will, a status which it contends it will be able to reacquire if the restrictive admissions provision is no longer enforceable. A trustee named by the settlor has standing

6. Segregated publicly-supported education deprives the children of the minority group of equal educational opportunities. Brown v. Board of Educ., 347 U.S. 483, 493–495, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

7. Compare Jaffe, Standing to Secure Judicial Review: Private Actions, 75 Harv. L.Rev. 255, 300 (1961).
No question is involved in this case of a state attempting to enforce the rights of its citizens "in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as parens patriae, when such representation becomes appropriate * * *." Commonwealth of Massachusetts v. Mellon, 262 U.S. 447, 486, 43 S.Ct. 597, 600, 67 L.Ed. 1078 (1923).

under state law to contest his removal. See Crawford's Estate, 340 Pa. 187, 16 A.2d 521 (1940); Neafie's Estate, 199 Pa. 307, 49 A. 129 (1901); cf. Thompson Will, 416 Pa. 249, 206 A.2d 21 (1965); Fraiman Estate, 408 Pa. 442, 184 A.2d 494 (1962). We see no reason why a removed trustee may not equally sue to regain its position if the condition on which its constitutional disability is founded may be obviated if its suit is successful.

The city does not, and probably could not, ask for its reinstatement as trustee by this court. But there is no overlooking the fact that it was removed solely on account of its incapacity to administer the discriminatory trust provision.[8] The basis of its case for reinstatement is the alleged illegality of that provision under, *inter alia*, federal constitutional law. Determination of the question of legality is a necessary precondition to a request for reinstatement. It is, therefore, an understatement to say that the city has a stake in the outcome of this lawsuit, and there is no reason to deny it the federal forum on the federal questions.

The defendants also argue that the governmental plaintiffs lack standing to assert the claims of count one here for reasons of comity. This court, they say, should not countenance an "attempt to bypass" the state courts which might ultimately "reflect on the competency, and indeed the fairness, of the courts of Pennsylvania."

The argument is impassioned but inadequate. The premise that plaintiffs seek to "challenge" previous decisions of the state courts prejudges the defense of res judicata, which, if valid, is a complete answer to any such attempted challenge. Moreover, to the extent that the trustees are requesting an exercise of discretion not to hear the federal claims it suffices to say that that discretion is lacking:

> "There are fundamental objections to any conclusion that a litigant who

has properly invoked the jurisdiction of a Federal District Court to consider federal constitutional claims can be compelled, without his consent and through no fault of his own, to accept a state court's determination of those claims. Such a result would be at war with the unqualified terms in which Congress, pursuant to constitutional authorization, has conferred specific categories of jurisdiction upon the federal courts, and with the principle that 'When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction * * *. The right of a party plaintiff to choose a Federal court where there is a choice cannot be properly denied.'" England v. Louisiana State Bd. of Medical Examiners, 375 U.S. 411, 415, 84 S.Ct. 461, 464, 11 L.Ed.2d 440 (1964).

## IV. THE PUBLIC ACCOMMODATIONS ACT: STARE DECISIS

Having disposed of the liminal questions of jurisdiction and standing, we now reach the substantive questions presented by the motion. We turn initially to count three of the complaint, the count that charges a violation of the Pennsylvania Public Accommodations Act, for the questions presented by this count are principally matters of law, well-suited to determination on a motion to dismiss.

Had the applicability of the act to Girard College been settled in the prior proceedings, we would not have to reach the res judicata defense to count three. Whether or not the parties or the cause were the same, we would be bound to adhere to the Pennsylvania courts' interpretation of the statute. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

That, however, is not the case. The issue was not decided by the Pennsylvania courts in any of the former pro-

---

8. See Girard College Trusteeship, 391 Pa. 434, 442–443, 446, 448, 449, 138 A.2d 844 (1958), appeal dismissed and cert. denied sub nom. Commonwealth of Pennsylvania v. Board of Directors of City Trusts, 357 U.S. 570, 78 S.Ct. 1383, 2 L.Ed.2d 1546 (1958).

ceedings. A fair reading of the hundreds of pages of opinions in those proceedings discloses nothing but silence on the possible application of the statute to Girard. Nowhere is it mentioned or alluded to. The reason seems to be that the argument was simply never made. While the statute was cited in the many briefs of the appellants [9] in the Supreme Court of Pennsylvania (twice in footnotes and once in a passing textual reference), each time it was included in a list of many statutes collected only to show a general and perhaps etherial disposition on the part of Pennsylvania to frown upon discrimination. Never was it suggested that the continued exclusion of Negroes from Girard College would violate the express terms of this statute; never was the statute so much as quoted; never was the court apprised of its terms. References to it were not only obscure but oblique.

 In these circumstances, stare decisis does not bar consideration of the application of the statute to Girard College. Stare decisis is founded on considerations of certainty and consistency of interpretation. It is axiomatic that if there has been in fact no interpretation, the doctrine of stare decisis has no bearing. It is universally recognized that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." Webster v. Fall, 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925). Accord, United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 37–38, 73 S.Ct. 67, 97 L.Ed. 54 (1952); KVOS, Inc. v. Associated Press, 299 U.S. 269, 279, 57 S.Ct. 197, 81 L.Ed. 183 (1936); United States v. Mitchell, 271 U.S. 9, 14, 46 S.Ct. 418, 70 L. Ed. 799 (1926); United States ex rel. Arant v. Lane, 245 U.S. 166, 170, 38 S. Ct. 94, 62 L.Ed. 223 (1917); Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 210 F.2d 623, 628–629 (C.A. 3, 1954), aff'd, 348 U.S. 437, 75 S.Ct. 488, 99 L.Ed. 510 (1955). It is inconceivable that important questions of public policy could be thought to be settled authoritatively for future cases *sub silentio*. Faced with the appellate history of the prior proceedings, it is impossible to decide, as defendants urge, that the meaning of the act was fixed forever by two lengthy opinions containing not so much as a single reference to it.

Nevertheless, merely because an issue was not raised and decided does not necessarily mean that the *same parties* are not precluded from raising it and having it decided in a new lawsuit. Accordingly, it becomes necessary to pass to a consideration of res judicata.

## V. THE PUBLIC ACCOMMODATIONS ACT: RES JUDICATA

The defense of res judicata has been raised by motion rather than answer, notwithstanding that it is an affirmative defense. See F.R.Civ.P. 8(c). Although this procedure has been sanctioned, Williams v. Murdoch, 330 F.2d 745, 749 (C. A. 3, 1964); Hartmann v. Time, Inc., 166 F.2d 127, 131, 1 A.L.R.2d 370 (C.A. 3, 1948), cert. denied, 334 U.S. 838, 68 S.Ct. 1495, 92 L.Ed. 1763 (1948), it is usually necessary to attach a documentary record to the motion so that the court can decide whether the action is foreclosed by the prior proceeding. No such record has been presented by the defendants, but the res judicata issue of count three involves only questions of law and the reported opinions of the Supreme Court of Pennsylvania disclose enough about the proceedings and parties to permit an informed decision.

 The effect of a former state court adjudication on the claim of count three in this action is governed by the law of Pennsylvania. Oklahoma Packing Co. v. Oklahoma Gas & Electric Co., 309 U.S. 4, 60 S.Ct. 215, 84 L.Ed. 447 (1940); Gramm v. Lincoln, 257 F.2d 250 (C.A. 9, 1958); Hartmann v. Time, Inc., 166 F. 2d 127, 1 A.L.R.2d 370 (C.A. 3, 1948), cert. denied, 334 U.S. 838, 68 S.Ct. 1495,

9. Furnished to us by defendants.

92 L.Ed. 1763 (1948), Comment, RES JUDICATA IN THE FEDERAL COURTS: APPLICATION OF FEDERAL OR STATE LAW, 51 Corn.L.Q. 96 (1965). The parties are agreed that the former proceeding was not a class action. There is no contention that the present individual plaintiffs are bound by the earlier judgment because of the participation of the earlier individual petitioners who sought admission to Girard College. Rather it is argued that the individual plaintiffs are barred because they were represented by the Attorney General, who appeared in the prior proceeding. It thus becomes necessary to ascertain precisely whom the Attorney General represents when he sues in his capacity as supervisor of charitable trusts.

Under Pennsylvania law,

"In the absence of statutory authority, no person whose interest is only that held in common with other members of the public, can compel the performance of a duty owed by the corporation to the public. Only a member of the corporation itself or someone having a special interest therein or the Commonwealth, acting through the Attorney General, is qualified to bring an action of such nature." Wiegand v. Barnes Foundation, 374 Pa. 149, 153, 97 A.2d 81, 82 (1953).

The Pennsylvania courts have followed section 391 of the Restatement of Trusts, and have permitted actions against a charitable trust by "the Attorney General, or by a person having a specific interest in such enforcement * * *." Miller Estate, 380 Pa. 172, 179, 110 A.2d 200, 203 (1955).[10] They have also made

it clear that when the Attorney General sues, "The Attorney General represents the public interest in a charitable trust rather than a particular class of potential beneficiaries * * *." Thompson Will, 416 Pa. 249, 259, 206 A.2d 21, 27, (1965). In the *Thompson Will* case, a trustee, representing the interests of undesignated "local charities" who were beneficiaries under a will, was given standing in addition to that conferred on the Attorney General on the ground that the charities' interests would be protected best by separate representation. Significantly, the court relied on Howard Sav. Inst. of Newark, N. J. v. Peep, 34 N.J. 494, 170 A.2d 39 (1961), in which standing had been conferred on an executor to represent the class of "Protestant Gentile boys" whose interests would be diluted by an application of *cy pres* to strike the religious restriction. The New Jersey Attorney General was held not to represent the class but the public. If, therefore, the Attorney General does not even represent the interests of the named class of beneficiaries, it certainly cannot be maintained that he represents an unnamed class of potential beneficiaries seeking, as a matter of law, to be treated on the same footing.

The Attorney General's function is distinct. His is the public eye which watches over the exercise of the power that may be agglomerated by charitable trustees, both because quite often there are no sufficiently definite beneficiaries who can do it and because even when there are they may not do it adequately from the public standpoint. See Pruner Estate, 390 Pa. 529, 531–532, 136 A.2d 107 (1957).[11] The Attorney Gen-

---

10. To the same effect, see Rest. Trusts 2d § 391 (1959); See also id., comment c; 4 Scott, Trusts § 391 (2d ed. 1956).

11. In Nevil Estate, 414 Pa. 122, 128–129, 199 A.2d 419 (1964), cited by defendants, it was held that a charity which hoped to become a recipient of a charitable bequest if *cy pres* were applied to the fund was not entitled to notice of the proceedings. "[T]he Attorney General acts for and on behalf of all such parties where the trust is for a charitable purpose."

Id. at 128, 199 A.2d at 422. In that case, however, the charity was only one of many organizations to which a gift might be given. It had "no standing or status as would entitle it * * * to challenge in any manner an order or a decree rendered in proceedings concerned with this charitable trust." Id. at 129, 199 A.2d at 423. It had "no interest different in kind from that of the public generally * * *." Id. at 128, 199 A.2d at 422.

The same cannot be said of the present individual plaintiffs, who, if successful,

eral is not committed to the narrow, parochial interests of a private litigant or class.

"Where the party to be bound in a second proceeding is different from the party against whom the original adjudication was made, a close relationship between them is a requirement of fairness and may be necessary to provide due process of law. Thus, the rule that only parties and privies are bound by a prior judgment is unquestionably correct. * * *" Bruszewski v. United States, 181 F.2d 419, 422 (C.A. 3, 1950), cert. denied, 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950).

The present minor plaintiffs were not represented by the Attorney General in the former proceedings. They have not yet had their opportunity to be heard. Cf. DEVELOPMENTS IN THE LAW— RES JUDICATA, 65 Harv.L.Rev. 818, 858 (1952). To hold that they have might even raise a serious question of due process, cf. Hansberry v. Lee, 311 U. S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940)— quite needlessly in our view, for under the Pennsylvania law of charities the prior judgment is no bar to the suit by the present individual plaintiffs. Cf. Schulz Estate, 374 Pa. 459, 466, 98 A.2d 176 (1953), cert. denied, Schulz v. Flora, 346 U.S. 885, 74 S.Ct. 135, 98 L.Ed. 390 (1953).

The effect of the prior proceedings on the ability of the governmental plaintiffs to maintain the instant suit presents entirely different questions. The extent to which the Attorney General is bound by earlier judgments when he sues in his capacity as supervisor of charitable trusts has never been decided by the courts of Pennsylvania, and rarely has it been touched on in other jurisdictions. But cf. Commonwealth ex rel. Marshall v. Beeman, 299 Ky. 26, 184 S.W.2d 117 (1945). Therefore, "[w]e are required to consider such approach to the problem as may be indicated by the Pennsylvania cases in the general field and to resort to general applicable principles to reach a conclusion consistent with Pennsylvania law." Makariw v. Rinard, 336 F.2d 333, 334 (C.A. 3, 1964).

■ Confining the discussion to count three, it is, of course, ordinarily true that a party is precluded from raising in a subsequent suit issues which were or might have been raised in the former suit on the same cause of action. Jackson v. Irving Trust Co., 311 U.S. 494, 61 S.Ct. 326, 85 L.Ed. 297 (1941); Jones v. Costlow, 354 Pa. 245, 47 A.2d 259 (1946). "A decree is not the less conclusive because an argument, afterwards thought to be important, was not, in proper time, urged upon the consideration of the court." City of Philadelphia v. Heirs of Stephen Girard, 45 Pa. 9, 30 (1863). See REST. JUDGMENTS § 63 (1942).

■ Res judicata aims at the promotion of efficient disposition of lawsuits and the discouragement of repetitious and harassing litigation. Caterpillar Tractor Co. v. International Harvester Co., 120 F.2d 82, 139 A.L.R. 1 (C.A. 3, 1941); Stevenson v. Silverman, 417 Pa. 187, 208 A.2d 786 (1965), cert. denied, 382 U.S. 833, 86 S.Ct. 76, 15 L.Ed.2d 76 (1965); Loughran v. Matylewicz, 367 Pa. 593, 81 A.2d 879 (1951). Although broadly applied, it is a principle which admits of some flexibility. See England v. Louisiana State Bd. of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964); Spilker v. Hankin, 88 U.S.App.D.C. 206, 188 F.2d 35 (1950); Larsen v. Larsen, 392 Pa. 609, 141 A.2d 353 (1958); 1B MOORE, FEDERAL

---

would have a right to be treated as other eligible poor male orphans. They possess, therefore, the sufficient special interest described by the Restatement to sue in their own behalf. Indeed, the Public Accommodations Act, as will be seen, gives the victim of discrimination a civil action for damages or injunctive relief. Thus, their standing is materially different from that of the purely speculative, if hopeful, beneficiary in Nevil Estate.

The Attorney General sues for the public, for those who have no such special interest. See Rest.Trusts 2d § 391, comment d (1959). He does not conclude those who do. Cf. Hughes v. Eleventh Ward Republican Club, 389 Pa. 103, 106, 132 A.2d 681 (1957).

PRACTICE ¶ 0.405 [11].[12] In the instant case, a compelling argument can be made against enforcing res judicata against the Attorney General with all the strictness of dogma. Compare Brown v. Memorial Nat'l Home Foundation, 162 Cal.App.2d 513, 329 P.2d 118, 131, 75 A. L.R.2d 427, cert. denied, 358 U.S. 943, 79 S.Ct. 353, 3 L.Ed.2d 352 (1959). We refrain from taking such a position in this case, however. The parties have not fully argued the need for a less stringent standard when the Attorney General sues as supervisor of charitable trusts. But in any event, this is a question of state law in a federal court, and

> "we find no persuasive indication in the opinions of the Supreme Court of Pennsylvania that it is prepared to make such an extension of established doctrine. Such a course may be desirable. But it is not now sufficiently foreshadowed in * * * Pennsylvania law * * *." Jamison v. City of Pittsburgh, 360 F.2d 162, 163 (C.A. 3, 1966).

The Pennsylvania courts have given great weight to the principle of finality in litigation. They have sometimes insisted on exact concurrence of the "four identities" of (1) "the thing sued for"; (2) the cause of action; (3) the parties; and (4) "the quality in the persons for or against whom the claim is made." Cameron Bank v. Aleppo Township, 338 Pa. 300, 304, 13 A.2d 40, 41 (1940); Fisher Building Permit Case, 355 Pa. 364, 368, 49 A.2d 626 (1946). More often, however, minor differences in the form of the proceedings, in the allegations and in the relief have been disregarded in order to avoid relitigation. See, e. g., Stevenson v. Silverman, 417 Pa. 187, 208 A.2d 786 (1965), cert. denied, 382 U.S. 833, 86 S. Ct. 76, 15 L.Ed.2d 76 (1965); Downing v. Halle Bros. Co., 395 Pa. 402, 150 A.2d 719 (1959); Helmig v. Rockwell Mfg. Co., 389 Pa. 21, 131 A.2d 622 (1957), cert. denied, 355 U.S. 832, 78 S.Ct. 46, 2 L.Ed.2d 44 (1957); Wallace's Estate, 316

Pa. 148, 174 A. 397 (1934); Havir's Estate, 283 Pa. 292, 129 A. 101 (1925). Such departures from strict conceptualism serve to point up the pervasive Pennsylvania policy that the purpose of res judicata is to prevent

> "'* * * a second trial on the same cause between the same parties. The thing which the court will consider is whether the ultimate and controlling issues have been decided in a prior proceeding in which the present parties actually had an opportunity to appear and assert their rights. If this be the fact, then the matter ought not to be litigated again * * *.'" Stevenson v. Silverman, 417 Pa. 187, 192, 208 A.2d 786, 788 (1965), cert. denied, 382 U.S. 833, 86 S.Ct. 76, 15 L.Ed.2d 76 (1965) (emphasis omitted).

See also Williamson v. Columbia Gas & Electric Corp., 186 F.2d 464, 467 (C.A. 3, 1950), cert. denied, 341 U.S. 921, 71 S.Ct. 743, 95 L.Ed. 1355 (1951).

We are not at liberty to dispense with state policies so unequivocally stated, in the absence of any indication whatever that the rules might be different for the Attorney General. Cf. REST. JUDGMENTS § 78, comment d (1942). No such indication can be discerned. Indeed, in Duquesne Light Co. v. Pittsburgh Rys. Co., 413 Pa. 1, 5–6, 194 A.2d 319 (1963), the Pennsylvania Supreme Court held broadly that the defense of illegality is encompassed in the doctrine of res judicata like other defenses.

Applying these principles to the instant case, it must be concluded that the Attorney General, the Commonwealth and the City are precluded by res judicata from claiming that Girard College is violating the Pennsylvania Public Accommodations Act.

It is contended by these plaintiffs that the present suit rests on a new cause of action, based on a new wrong consisting of the denial of admission to the individual plaintiffs in December 1965. This

12. Conversely, Pennsylvania has recognized that finality is of unusually great importance in certain areas. See List Adoption Case, 418 Pa. 503, 516–517, 211 A. 2d 870 (1965).

position cannot be sustained. The Pennsylvania courts have assiduously avoided exceptions to res judicata based on purely formal differences in causes of action. While the minor plaintiffs' right to sue may derive from the events of December 1965, the governmental plaintiffs' rights of action arose from the continuing policy of restrictive admissions which was the very reason for the substitution of trustees. Nothing new has occurred since that would make the operation of Girard College on that basis any more a violation of the statute than it might have been at the time of the substitution of trustees.[13] Plaintiffs argue, however, that the only issue in the previous litigation was "whether or not the decree of the Orphans' Court removing the Board of City Trusts and substituting the present defendants was consistent with the prior opinion of the Supreme Court of the United States." Cf. John McShain, Inc. v. Eagle Indemnity Co., 80 F.Supp. 417 (E.D.Pa., 1948). But the original purpose of the earlier proceeding was to end the discrimination, and it was clear at the time that the substitution of trustees could not have been accomplished if the racial restriction would violate a state penal law.[14] The governmental plaintiffs contended then that the proposed substitution would violate Pennsylvania public policy generally. They could and should have made the argument of illegality at that time; they cannot make it now.

We express no view, however, on the application of res judicata to bar the governmental plaintiffs from asserting the claims of counts one and two. As to count one, entirely different problems might be presented. Compare State Farm Mutual Auto. Ins. Co. v. Duel, 324 U.S. 154, 162, 65 S.Ct. 573, 89 L.Ed. 812 (1945); Blair v. Commissioner of Internal Revenue, 300 U.S. 5, 9, 57 S.Ct. 33, 81 L.Ed. 465 (1937); Eaton v. Grubbs, 329 F.2d 710 (C.A. 4, 1964); Christian v. Jemison, 303 F.2d 52 (C.A. 5, 1962), cert. denied, 371 U.S. 920, 83 S.Ct. 287, 9 L.Ed.2d 229 (1962), with Bruszewski v. United States, 181 F.2d 419, 422–423, cert. denied, 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950); United States Lines Co. v. Maritime Ship Cleaning & Maintenance Co., 235 F.Supp. 259, 261 (E.D. Pa., 1964); Delaware River Port Auth. v. Pennsylvania Public Util. Comm'n, 408 Pa. 169, 177, 182 A.2d 682 (1962); Love v. Temple Univ., Pa., Legal Intelligencer, July 6, 1966. As to count two, the alleged existence of changed circumstances and intervening deviations from the will might affect the rights of the parties, cf. Lawlor v. National Screen Service Corp., 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948); Amrhein v. Quaker City Dye Works, 192 Pa. 253, 43 A. 1008 (1899), but that is largely a factual question which need not be decided now.

## VI. ABSTENTION

The prayer of the complaint in this action contains a proviso stating that plaintiffs would not oppose entry of an order directing them to begin an action in the state courts to allow the Pennsylvania courts to pass upon counts two and three of the complaint.[15] Neither side has

---

13. Compare, however, the allegations and arguments respecting counts one and two.

14. This, of course, is not inconsistent with our conclusion on stare decisis, supra, since the provisions of this particular law were not before the court.

15. The proviso reads as follows:
"*PROVIDED*, that plaintiffs would not oppose the entry of an order directing plaintiffs to institute an action in the form set out in Appendix "F" attached hereto in the Orphans Court of the County of Philadelphia, in order that the courts of the Commonwealth of Pennsylvania may have due opportunity to decide promptly and expeditiously all issues pendant [sic] to the present litigation arising under the law of the Commonwealth of Pennsylvania so that this matter can be disposed of before the beginning of the fall school term, as long as this Court takes and retains all jurisdiction requisite to an expeditious hearing and disposition of all issues raised

urged the pursuit of this course, but a federal court should consider its appropriateness.

■ The assumption of pendent jurisdiction is not an irrevocable commitment to its exercise. A federal court may stay its hand pending state court resolution of a state law issue in a case "if a definitive ruling on the state issue would terminate the controversy." Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 498, 61 S.Ct. 643, 644, 85 L.Ed. 971 (1941). Abstention "does not, of course, involve the abdication of federal jurisdiction, but only the postponement of its exercise", Harrison v. NAACP, 360 U.S. 167, 177, 79 S.Ct. 1025, 1030, 3 L.Ed. 2d 1152 (1959), pending the outcome of a reasonably prompt state court determination on the merits of the state claims. See England v. Louisiana State Bd. of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).[16] Something more than just an ordinary and uncertain state law question must be present before reference to the state courts is called for. Meredith v. City of Winter Haven, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9 (1943). In *Pullman* that something was the tentativeness of a federal construction "which may be displaced tomorrow by a state adjudication." 312 U.S. at 500, 61 S.Ct. at 645. Tentativeness, of course, accompanies every federal pronouncement on an unresolved question of state law. None can wholly "escape being a forecast rather than a determination," id. at 499, 61 S.Ct. at 645, in the sense of being a finally settled rule of law. It is when tentativeness is accompanied by a threat to the uniform application of the law of a state that abstention may be necessary.[17]

If the only state law questions in this case concerned the claim under the will in count two, there could be no justification for abstention. No general public policy of Pennsylvania would be affected by a construction of Girard's will. Such a construction is a one-time enterprise, presenting none of the hazards of tentativeness. The Pennsylvania courts have time and again cautioned against stare decisis in the interpretation of wills. See, e. g., Nicholson's Estate, 355 Pa. 426, 50 A.2d 283, 172 A.L.R. 450 (1947); Elkins' Estate, 339 Pa. 193, 12 A.2d 83 (1940); Brennan's Estate, 324 Pa. 410, 188 A. 160 (1936); Knoll v. Hart, 308 Pa. 223, 162 A. 228 (1932). "In ascer-

by the foregoing Complaint in the event that:

(i) Decisions of the Supreme Court of the United States or statutes enacted by the Congress of the United States establish individual plaintiffs' constitutional or statutory rights to summary admission to institutions such as Girard College;

(ii) The proceedings before the Courts of the Commonwealth are unreasonably delayed for whatever reason; or

(iii) The Courts of the Commonwealth of Pennsylvania render decisions adverse to the interests of plaintiffs herein on all relevant claims of rights arising under the laws of the Commonwealth of Pennsylvania."

16. Abstention possesses the additional virtue, in contrast to outright dismissal, that when the state courts pass on the state claims they must view them "in light of the constitutional objections presented to the District Court", Government & Civic Employees Organizing Committee v. Windsor, 353 U.S. 364, 366, 77 S.Ct. 838, 839, 1 L.Ed.2d 894 (1957), even though the litigant need not present his federal claims to the state courts for decision but only to "inform those courts what his federal claims are," so that they may be seen in full context. England v. Louisiana State Bd. of Medical Examiners, 375 U.S. 411, 420, 84 S.Ct. 461, 467, 11 L.Ed.2d 440 (1964). See also Martin v. Creasy, 360 U.S. 219, 225, 79 S.Ct. 1034, 3 L.Ed.2d 1186 (1959); Harrison v. NAACP, 360 U.S. 167, 177–178, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959).

17. Thus, for instance, it has been held repeatedly that the federal courts should not take any premature action that might interfere with the orderly conduct of state programs or regulatory schemes. E. g., Martin v. Creasy, 360 U.S. 219, 79 S.Ct. 1034, 3 L.Ed.2d 1186 (1959); Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); Spector Motor Serv., Inc. v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944); Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L. Ed. 1424 (1943).

taining the intention of the testator or settlor, it has been frequently said that no will has a brother, twin brother, or double." Clark v. Clark, 411 Pa. 251, 256, 191 A.2d 417, 420 (1963). Because testamentary intent is paramount, "'* * * precedents are of little value in the construction of wills * * *.'" Metzgar Estate, 395 Pa. 322, 327, 148 A.2d 895, 898 (1959).

If, therefore, there were a possibility of avoiding the unique constitutional questions presented in this case by a limiting construction of the exclusionary will provision in light of whatever new conditions might be shown,[18] this court could give it—subject to the prior state court constructions—without fear of unduly invading the law-making prerogatives of the state courts. No interest of federalism could be said to override plaintiffs' right to have count two decided with the rest of the lawsuit.

■■■ Count three, on the other hand, does present legal questions of more general applicability in Pennsylvania. The Public Accommodations Act, however, is hardly a new and unconstrued state law.[19] Compare Harrison v. NAACP, 360 U.S. 167, 178, 79 S.Ct. 1025, 1031, 3 L.Ed.2d 1152 (1959), in which the statute was characterized as not yet "a complete product of the State * * *." To be sure, the people of a state ought to be able to have its debatable and important public policies determined in the first instance by its own courts. But the state law issues must first present some real difficulty or uncertainty to justify the fracturing of a lawsuit which has been properly brought in federal court. For to constitute a threat to uniformity, an imminent federal decision would have

to run the risk of becoming an obsolete aberration. It is, therefore, established beyond question that if the state law is not unsettled abstention is unwarranted. Griffin v. County School Bd., 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Turner v. City of Memphis, 369 U.S. 350, 82 S.Ct. 805, 7 L.Ed.2d 762 (1962). In Harman v. Forssenius, 380 U.S. 528, 535, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965), the Supreme Court decided that if the proper application of the statute in question is not in doubt, "it is the duty of the federal court to exercise its properly invoked jurisdiction", even though that may make it necessary to adjudicate a federal constitutional question. Conversely, if the state statute is not fairly subject to an interpretation which will render it necessary to reach the federal constitutional question, there is all the less reason to abstain. That, as will be shown, is exactly the case here. Viewing the Public Accommodations Act straightforwardly [20] and utilizing the adequate and authoritative materials available as aids in construing it, it seems to us that the act is clearly applicable to Girard College. Consequently, although the applicability of the act to private schools has not yet been decided in Pennsylvania, the issue here is not sufficiently murky to require state court determination.

Even were this not so, to the extent that abstention rests on considerations of comity, see Harrison v. NAACP, 360 U.S. 167, 176, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959); Martin v. Creasy, 360 U.S. 219, 224, 79 S.Ct. 1034, 3 L.Ed.2d 1186 (1959), the fact that the state executive and its chief law enforcement officer have chosen to bring the suit in federal court goes far to sustain the exercise of

18. Cf. Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958); United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1953).

19. It has long been on the statute books and has several times been interpreted by Pennsylvania courts, including the state supreme court. See part VII, infra.

20. Needless to say, a construction designed in part to obviate the constitutional problems would not be permissible with respect to count three, as it might for count two, because the asserted constitutional difficulties do not arise from the Public Accommodations Act. The continuing authorization, if any, for the racial exclusion stems instead from the will. See note 18, supra, and accompanying text.

our jurisdiction to construe the Public Accommodations Act. The people of Pennsylvania choose their judges to interpret and shape their laws, but they also elect their Attorney General to manage their litigation and to choose the appropriate forum in which to sue. It is also significant that no state official or agency is a party-defendant demanding that the plaintiffs be remitted to the state courts. Decision of the state law issues of counts two and three would in no way frustrate or impede state governmental functions.

■ The considerations which have been convassed here were summed up in Harman v. Forssenius, 380 U.S. 528, 534, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965), in which abstention was said to be proper "in order to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication." None of these dangers is present in any substantial measure in the instant case. The state executive wants a federal determination. The trustees have intimated no desire to the contrary. Cf. Hostetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 329, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964). No state operations are impaired. The meaning of the statute is not, upon analysis, in doubt. And no constitutional question need be decided. Only the cause of delay would be served by waiting for a suit to be brought and decided in state courts, and this would be incompatible with the interests of all concerned. See Harman v. Forssenius, 380 U.S. 528, 537, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); Hostetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 329, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964); Baggett v. Bullitt, 377 U.S. 360, 378–379, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); Griffin v. County School Bd., 377 U.S. 218, 229, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964). Abstention would not be proper in these circumstances.

## VII. THE PUBLIC ACCOMMODATIONS ACT: APPLICABILITY

The Pennsylvania Public Accommodations Act, enacted in 1887, Act of May 19, 1887, P.L. 130, § 1, prohibits racial discrimination in places of public accommodation, resort or amusement. Since its amendment in 1935, the term "place of public accommodation, resort or amusement" has been "deemed to include," among many other facilities, "kindergartens, primary and secondary schools, academies, colleges and universities, extension courses, and all educational institutions under the supervision of this Commonwealth * * *." Act of June 11, 1935, P.L. 297, § 1, as amended by Act of June 24, 1939, P.L. 872, § 654, 18 P.S. § 4654(c). The proviso of subsection (d) states: "Nothing contained in this section shall be construed to include any institution, club or place or places of public accommodation, resort or amusement, which is or are in its or their nature distinctly private * * *." 18 P.S. § 4654(d).[21]

21. The entire statute reads as follows:
"(a) All persons within the jurisdiction of this Commonwealth shall be entitled to the full and equal accommodations, advantages, facilities, and privileges of any places of public accommodation, resort or amusement, subject only to the conditions and limitations established by law and applicable alike to all persons. Whoever, being the owner, lessee, proprietor, manager, superintendent, agent or employe of any such place, directly or indirectly refuses, withholds from, or denies to, any person, any of the accommodations, advantages, facilities or privileges thereof, or directly or indirect-

ly publishes, circulates, issues, displays, posts or mails any written or printed communication, notice or advertisement to the effect that any of the accommodations, advantages, facilities and privileges of any such places, shall be refused, withheld from, or denied to, any person on account of race, creed, or color, or that the patronage or custom thereat of any person belonging to, or purporting to be of, any particular race, creed or color is unwelcome, objectionable or not acceptable, desired or solicited, is guilty of a misdemeanor, and upon conviction thereof, shall be sentenced to pay a fine of not more than one hundred dollars ($100),

The applicability of this statute to Girard College depends on the answers to two questions: (1) Is Girard College a "public accommodation" within the meaning given that term by subsections (a) and (c)? and (2) Is Girard College an institution "in its * * * nature distinctly private," as that phrase is used in subsection (d)?

The answer to the first inquiry admits of no doubt. The language of subsection (c) is obviously quite inclusive. Educational institutions of many varieties are comprehended. Some, such as "academies," are most often privately-operated; yet no distinction between those and public academies (assuming there are any in Pennsylvania) was sought to be made. All educational institutions are covered if they are "under the supervision of this Commonwealth."

 Plainly, supervision does not in this context mean ownership or opera-

tion. Rather it means that minimal supervision the Commonwealth gives even to private schools.[22] It imports the regulation of such matters as attendance, curricula and activities—matters in which private as well as public schools are subject to state standards. See, e. g., 24 P.S. § 13–1327. The complaint alleges that the Commonwealth requires compliance by Girard College with the requirements of § 13–1327 and other generally applicable standards. The College is therefore "an educational institution under the supervision of this Commonwealth." If only publicly-operated schools were covered by subsection (c) of the Public Accommodations Act, it would, as respects schools, be superfluous, because an older statute, the Act of May 18, 1911, as amended, 24 P.S. § 13–1310, long ago made it "unlawful for any school directors, superintendent, or teacher to make any distinction whatever, on account of, or by reason of, the

or shall undergo imprisonment for not more than ninety (90) days, or both.

"(b) The production of any such written or printed communication, notice or advertisement, purporting to relate to any such place and to be made by any person being the owner, lessee, proprietor, superintendent or manager thereof, shall be presumptive evidence in any civil or criminal action that the same was authorized by such person.

"(c) A place of public accommodation, resort or amusement, within the meaning of this section shall be deemed to include inns, taverns, roadhouses, hotels, whether conducted for the entertainment of transient guests, or for the accommodation of those seeking health, recreation or rest, or restaurants or eating houses, or any place where food is sold for consumption on the premises, buffets, saloons, bar-rooms, or any store, park, or inclosure where spirituous or malt liquors are sold, ice cream parlors, confectionaries, soda fountains, and all stores where ice cream, ice and fruit preparations, or their derivatives, or where beverages of any kind, are retailed for consumption on the premises, drug stores, dispensaries, clinics, hospitals, bathhouses, theatres, motion picture houses, airdromes, roof gardens, music halls, race courses, skating rinks, amusement and recreation parks, fairs, bowling alleys, gymnasiums, shooting galleries, billiard

and pool parlors, public libraries, kindergartens, primary and secondary schools, high schools, academies, colleges and universities, extension courses, and all edutional institutions under the supervision of this Commonwealth, garages and all public conveyances operated on land or water, as well as the stations and terminals thereof.

"(d) Nothing contained in this section shall be construed to include any institution, club or place or places of public accommodation, resort or amusement, which is or are in its or their nature distinctly private, or to prohibit the mailing of a private communication in writing sent in response to a specific written inquiry."

22. An idea of what was contemplated by the phrase "all educational institutions under the supervision of this Commonwealth" can be gleaned from section 3 of the Fair Educational Opportunities Act, 24 P.S. § 5003(1), which (although it applies to post-secondary, commercial and trade schools) defines "educational institution" as a school "which is subject to the visitation, examination or inspection of, or is, or may be licensed by the Department of Public Instruction, including [any school] incorporated or chartered under any general law or special act of the General Assembly, except any religious or denominational educational institution as defined in this act."

race or color of any pupil or scholar who may be in attendance upon, or seeking admission to, any public school maintained wholly or in part under the school laws of the Commonwealth." The wording of that statute makes it clear that when the legislature meant to embrace only publicly-supported schools it knew how to say so in no obscure terms.

The applicability of a comparable provision in New York has previously been litigated. In McKaine v. Drake Bus. School, Inc., 107 Misc. 241, 176 N.Y.S. 33 (App. Term 1st Dept., 1919), a privately-operated business school had advertised on billboards and public transportation stations for students. The statute at that time (it has since been amended) covered schools "under the supervision of the Regents of the State of New York," just as the Pennsylvania statute covers schools "under the supervision of this Commonwealth." (Its "distinctly private" proviso at that time was also substantially identical with Pennsylvania's.) The court unanimously held that it was error to have dismissed a complaint charging racial discrimination in admission to such a school. It was accepted without question or discussion that private schools were intended to be considered public accommodations unless for some reason they were within the proviso—an issue which the court in *McKaine* found it unnecessary to reach.[23]

However, that issue must be reached here, for it is at the heart of the controversy over count three. What scope is to be accorded to the phrase, "in its * * * nature distinctly private"? The principal question is whether a purposeful distinction can be drawn between a school which is in its nature distinctly private (hence within the proviso) and a school which is just plain private (hence within the coverage of the main section).[24]

The Pennsylvania Public Accommodations Act reflects the Commonwealth's strong public policy against discrimination in community facilities.[25] When in 1935 the list of the types of places deemed to be public accommodations was added to the act by subsection (c), it was declared on the floor of the state Senate that the reason for the specification was "to amplify what it [the 1887 act] meant by places of amusement and other places, used in general terms." 1935 Pa.Leg.Journ. 4434 (remarks of Sen. Shapiro). The purpose of the amendment (which also raised the penalty for violation) was to "put teeth into this bill" and give notice to would-be violators "that what the Legislature said in the original act was intended to mean something and that people should not be discriminated against because of race or color." Id. at 4434–4435.[26] Immediately after this statement on the floor, the

---

23. Because the advertising of the Drake School made it "difficult to hold" that it could be distinctly private and in any event the burden of pleading and proving that a defendant was within the coverage of a proviso was on the defendant. 107 Misc. at 243, 176 N.Y.S. at 34.

24. The words "proviso" and "exception" will be used interchangeably throughout to refer to the provisions of subsection (d), notwithstanding any technical differences there may be between the two terms; and the phrase "main section" will be used to refer to the provisions of subsections (a) and (c).

25. Cf. 18 P.S. § 4653, prohibiting discrimination in public accommodations on account of religion, creed or nationality, and the Pennsylvania Human Relations Act,

43 P.S. § 951 et seq., which is comparable to the Public Accommodations Act, but provides for enforcement through the administrative machinery of the Human Relations Commission. See particularly 43 P.S. § 954(*l*).

26. Recent Pennsylvania cases appear to countenance reference to floor debates to ascertain the meaning of statutory provisions. In Rossiter v. Whitpain Township, 404 Pa. 201, 204, 170 A.2d 586 (1961), the use of "contemporaneous legislative history" was considered "proper," and in Commonwealth v. Levy, 26 Pa.Dist. & Co.R.2d 429 (Q.S. Lackawanna Co., (1961), aff'd on opinion below, 197 Pa.Super. 297, 178 A.2d 858 (1962), *Rossiter* was read as authorizing extensive reference to debates to deter-

bill was passed with but one dissenting vote.

The strength of Pennsylvania's aversion to discrimination in public accommodations is attested by the broad construction its courts have given the statute. They have held that the enumerated places in the list of accommodations are merely illustrative and not exhaustive. Everett v. Harron, 380 Pa. 123, 110 A.2d 383 (1955); Commonwealth v. Figari, 166 Pa.Super. 169, 70 A.2d 666 (1950). They have allowed a private civil action to enjoin discriminatory treatment or to secure damages on account of it, though the statute is in terms only criminal. Everett v. Harron, supra; Lackey v. Sacoolas, 411 Pa. 235, 191 A.2d 395 (1963). They have permitted the Commonwealth to bring an injunction action as well. Commonwealth v. Gibney, 21 Pa.Dist. & Co.R. 2d 5 (C. P. Chester Co., 1959). And they have been quick to pierce the veil of accommodations in form private, in fact public. For example, in Lackey v. Sacoolas, supra, a swimming club which had routinely admitted whites to membership but had rejected all applications made by Negroes was held to be a mere subterfuge for a public pool. A similar result had earlier been reached in more obvious circumstances of evasion in Everett v. Harron, supra. Compare In the Matter of Castle Hill Beach Club, Inc. v. Arbury, 2 N.Y.2d 596, 162 N.Y.S.2d 1, 142 N.E.2d 186 (1957).

In the instant case, there is, of course, no question of subterfuge. Apart from the allegations of state involvement in the operation of Girard College, no one denies that it is a private school. The question is whether, in the light of Pennsylvania's strong policy against discrimination, all private schools, some private schools (if so, which kinds?), or no private schools are exempted from the strictures of subsections (a) and (c) by the proviso of subsection (d).

The exception for "places of public accommodation" which are "in their nature distinctly private" appears on the surface to be a contradiction in terms. See Note, RACE EQUALITY BY STATUTE, 84 U.Pa.L.Rev. 75, 82 (1935). But it is a traditional and important function of courts to reconcile such seeming conflicts in statutes and to give coherent implementation to legislative purposes clearly expressed in principle but less clearly in application. The process of construction often requires the harmonization of competing statutory ends. "Statutes come out of the past and aim at the future. They may carry implicit residues or mere hints of purpose. Perhaps the most delicate aspect of statutory construction is not to find more residues than are implicit nor purposes beyond the bound of hints." FRANKFURTER, SOME REFLECTIONS ON THE READING OF STATUTES, 47 Colum.L.Rev. 527, 535 (1947). "And so the bottom problem is: What is below the surface of the words and yet fairly a part of them?" Id. at 533. It is therefore incumbent on us to ascertain the statutory ends and to give the act a meaning which will effectuate them concretely. Cf. Francis v. Corleto, 418 Pa. 417, 425, 211 A.2d 503 (1965).

Defendants' argument that all private schools were intended to be excepted from the operation of the anti-discrimination provisions manifestly cannot be supported. It has already been shown that subsections (a) and (c) unquestionably encompass at the very least *some* private schools. To adopt defendants' construction would allow a general exception to nullify that quite explicit language. Cf. Waits' Estate, 336 Pa. 151, 154, 7 A.2d 329 (1939); STATUTORY CONSTRUCTION ACT OF 1937, P.L. 1019, § 63, 46 P.S. § 563. Beyond that, it would fly in the face of the express wording of the proviso that only "*distinctly* private" institutions were to be excepted. Provisos are strictly con-

mine the precise meaning of statutory terms. See also Loeb v. Benham, 153 Pa. Super. 601, 34 A.2d 835 (1943). But see

Martin Estate, 365 Pa. 280, 74 A.2d 120 (1950); Tarlo's Estate, 315 Pa. 321, 172 A. 139 (1934).

strued in Pennsylvania. Commonwealth ex rel. Margiotti v. Lawrence, 326 Pa. 526, 531, 193 A. 46 (1937); Wirtz v. Phillips, 251 F.Supp. 789, 801 (W.D.Pa. 1965). They are qualifiers, not nullifiers. Cf. Friese's Estate, 317 Pa. 86, 88–89, 176 A. 225 (1934).

Since at least some private schools must be considered public accommodations within the meaning of subsections (a) and (c), the issue becomes whether schools are the type of institution which can ever be in their nature distinctly private for the purposes of this statute.

■ We think that they cannot.[27] Many different types of places and institutions are enumerated in subsection (c) of the statute. They range from barrooms and ice cream parlors to hospitals and race courses to bowling alleys and schools. No doubt a bar in a private home or a swimming pool for family use in a back yard is "in its * * * nature distinctly private." But apart from these very limited illustrations, it is extremely difficult to envision private versions of the kinds of places the statute calls "public accommodations." They are all ordinarily "in their nature" quite public in the sense that they depend for their functioning on the more-or-less indiscriminate drawing-together of people from various strata of the community. Thus there is the strong possibility that the legislature did not mean for subsection (d) to detract in the least from the public nature of any of the accommodations included in subsections (a) and (c), but merely intended to explain what was already obvious—namely, that while the list in subsection (c) was not exhaustive, subsection (a) did not extend to places of a very different order from the public places set forth in subsection (c).

According to this argument, then, the proviso may have been inserted only to express the thought that in determining what was a public accommodation the rule of *ejusdem generis* was to be employed, and only places of the same sort as those enumerated in subsection (c) were to be considered as falling within the ambit of subsection (a). "The office of a 'proviso' is to except something from the enacting clause, or to qualify or restrain its generality, or to exclude some possible ground of misinterpretation." Friese's Estate, 317 Pa. 86, 89, 176 A. 225, 226 (1934). From this vantage point, subsection (d) merely serves to explain or clarify, rather than limit, what precedes. When it is considered that the list in subsection (c) did not "purport to be exclusive of all places other than those specifically named", Everett v. Harron, 380 Pa. 123, 127, 110 A.2d 383, 385 (1955), the need for such a principle of limited extension becomes manifest.

This interpretation of the statute is suggested by a case decided shortly after both the illustrative list of places of public accommodation and the distinctly private proviso were added in 1935. In Commonwealth v. Moore, 32 Pa.Dist. & Co.R. 630 (Q. S. Dauphin Co., 1938), it was implied that a hotel, as an accommodation listed in subsection (c), could not be in its nature distinctly private.[28] It was said that the proviso of subsection (d) is "nothing more than an attempt to clarify [the] interpretation and construction" of the act. "It designates that a proper construction of the act shall not extend to institutions or clubs, etc., which are in their nature 'distinctly private'." Id. at 635. On this reading, to say, as subsection (c) of the act does, that a private school is a public accommodation is to end the inquiry.[29]

---

**27.** With possibly some rare exceptions not here material—a unique tutorial arrangement, perhaps.

**28.** Although, "irrespective of this, if the place is of a private nature, it is a matter of defense and not a matter necessary to be pleaded in the indictment." 32 Pa.Dist. & Co.R. at 635.

**29.** Cf. Everett v. Harron, 380 Pa. 123, 127, 110 A.2d 383, 385 (1955): "Certainly the building containing the shower and locker facilities constituted a bath-house, and it is difficult to imagine how the whole enterprise could be characterized as other than 'an amusement and recreation park'. The exclusion of the Negroes,

But it is not necessary in the case at bar to read the proviso so narrowly. It is possible to concede that subsection (d) may withdraw from the operation of subsection (a) some varieties of some of the accommodations specifically named in subsection (c). But not schools. No rational distinction can be drawn between schools which would be in their nature distinctly private and all other private schools, bearing in mind that any such distinction would have to be supportable in terms of the respective legislative purposes of subsections (a) and (c) and subsection (d).

■ The Pennsylvania statute borrowed the "in its nature distinctly private" terminology from the comparable New York and New Jersey statutes, N.Y. Civil Rights Law, §§ 40, 41; 18 N.J. S.A. §§ 25–1 et seq. See Note, 84 U.Pa. L.Rev. 75, 82 (1935). In interpreting statutes similar to or adopted from the laws of other states, courts appropriately look to the construction given to those statutes by the courts of those states. Such decisions, while not conclusive, are certainly persuasive. See the authorities collected in 3 SUTHERLAND, STATUTORY CONSTRUCTION § 6105 (Horack ed. 1943); 20 AM.JUR.2d, COURTS, § 204 (1965); 50 AM.JUR., STATUTES, § 460 (1944); 82 C.J.S. Statutes § 373b (1953). For recent cases in which the Supreme Court of Pennsylvania has looked to foreign interpretation of similar statutes, see Thornton Estate, 420 Pa. 521, 526–527, 217 A.2d 746 (1966); Rufo v. Bastian-Blessing Co., 405 Pa. 12, 20–21, 173 A.2d 123 (1961); Ayers v. Morgan, 397 Pa. 282, 292–294, 154 A.2d 788 (1959). See also Consumers Time Credit Co. v. Remark Corp., 248 F.Supp. 158, 160–161 (E.D. Pa.1965). It is therefore instructive to consider how the New York and New Jersey courts have approached the reconciliation of the various statutory provisions.

Reference has already been made to McKaine v. Drake Bus. School, Inc., 107 Misc. 241, 176 N.Y.S. 33 (App.Term 1st Dept. 1919), the only New York case in which the private school question appears to have been litigated. In New Jersey, too, relatively few cases have considered this problem, but two recent decisions are especially illuminating. In Fraser v. Robin Dee Day Camp, 44 N.J. 480, 210 A.2d 208 (1965), an applicant was denied admission because of his race to a day camp run in conjunction with a private school and a nursery school. The New Jersey Supreme Court concluded that the denial violated the Public Accommodations statute. "A day camp is essentially an educational-recreational accommodation for children," which the court found to be "the type of accommodation which the Legislature intended to reach." 44 N.J. at 487, 210 A.2d at 212.[30]

The New Jersey statute is substantially the same as the Pennsylvania statute. Both have the same exception for institutions, clubs and accommodations in their nature distinctly private. So far as schools are concerned, the provisions are virtually identical, except that the New Jersey act contains additional provisions exempting "bona fide religious or sectarian" institutions from the operation of the statute and permitting secondary and post-secondary schools to use criteria other than race, creed, color, origin or ancestry in making admissions decisions. Of course, neither statute remotely purports to impede the operation of religious schools[31] or to prohibit the denial of admission on non-discriminatory grounds with or without the additional provisos; they only make explicit what the statutes

therefore, merely because of their race or color constitutes a violation of the act * * *."

30. It is perhaps significant that the proprietor of the facilities had conceded that the statute prohibited him from discriminating in the nursery school and private school, and had only challenged the requirement of non-discrimination in the day camp. 44 N.J. at 490, 210 A.2d at 213.

31. Cf. Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

did not intend. They are significant for present purposes only as further evidence of the intention to cover private schools in the main subsections.

The meaning of "in its nature distinctly private" was resolved in New Jersey by the recent case of Clover Hill Swimming Club v. Goldsboro, 47 N.J. 25, 219 A.2d 161 (1966). There a swimming club operated for profit and having facilities for only a limited number of members was deemed beyond the proviso. As in *Fraser*, the nature and purpose of the institution was controlling. The precise reasoning is particularly apposite in the present context. While the court relied on the subtle invitation to the public it found implied in the club's unobtrusive advertising, the principal reason for finding the club non-private was that:

"The statutory exemption for distinctly private organizations is designed to protect the personal associational preferences of their members. However, Clover Hill does not owe its existence to the associational preferences of its members but to the coin-

cidence of their interest in the facilities offered by the owners." 47 N.J. at 34, 219 A.2d at 166.

We think that *Clover Hill* settles the proper construction of the Pennsylvania Public Accommodations Act as applied to Girard College.[32] The purpose of subsections (a) and (c) was to create equal opportunity in the broad sense—to permit everyone to enjoy the facilities afforded in the community, including schools, without regard to race. It was designed to expand the scope of the accommodations considered to be public beyond the governmentally-owned, -operated or -assisted facilities already embraced by the equal protection clause of the Fourteenth Amendment. The exception of subsection (d) was carved out to protect the associational preferences of individuals where those preferences go to the reasons for the institution's continuing existence and where enforcement of the preferences is not likely to work a substantial interference with the equal opportunity goals of the main provisions.[33]

32. The brief, broad and ill-considered dictum in Howard Sav. Inst. of Newark v. Trustees of Amherst College, 61 N.J. Super. 119, 128, 160 A.2d 177, 182 (1960), to the effect that private colleges were within the proviso, was eloquently ignored by the supreme court on the appeal sub nom. Howard Sav. Inst. of Newark, N.J. v. Peep, 34 N.J. 494, 170 A.2d 39 (1961), and must now be taken to have been disavowed by the language and reasoning of the later New Jersey cases.

The California experience with the same statute is also enlightening. In California, the act was held not to extend to a private school. Reed v. Hollywood Professional School, 169 Cal.App.2d Supp. 887, 338 P.2d 633 (1959). For a critique of that decision, see Horowitz, The 1959 California Equal Rights in "Business Establishments" Statute—A Problem in Statutory Application, 33 So.Cal.L.Rev. 260, 274 (1960). In response to that and other, similarly grudging constructions, the California legislature substituted a statute prohibiting discrimination by "all business establishments of every kind whatsoever." Cal.Civ.Code §§ 51, 52. See generally Horowitz, supra; Annot., 87

A.L.R.2d 120, 167 (1963). Since then, the California courts have given the term "business establishments" a very inclusive meaning, stating that the term was used in "the broadest sense reasonably possible." Burks v. Poppy Const. Co., 57 Cal. 2d 463, 468, 20 Cal.Rptr. 609, 611, 370 P.2d 313, 315 (1962). See also Lee v. O'Hara, 57 Cal.2d 476, 20 Cal.Rptr. 617, 370 P.2d 321 (1962); Washington v. Blampin, 226 Cal.App.2d 604, 38 Cal.Rptr. 235 (1964). It is probably a fair inference that the *Reed* case has been overruled by the legislature, see Horowitz, supra, at 293; cf. Crawford v. Robert L. Kent, Inc., 341 Mass. 125, 167 N.E.2d 620 (1960), although the legislature may have imported into the law a distinction based on the profit motive which is absent in the Pennsylvania law. Cf. Annot., 87 A.L.R.2d 120, 127–28 (1963).

33. Quite obviously, to give effect to associational preferences in all instances would be to repeal the statute, for no question of discrimination would ever arise unless those who controlled the accommodation did not "prefer" to forego the company of Negroes.

In terms of its purposes, the application of the statute to Girard College becomes clear. A school, such as Girard, does not have as its primary goal the furtherance of the private preferences of its students. In *Clover Hill* reliance was placed on the fact that the swimming club did not "owe its existence to the associational preferences of its members * * *." Any school—and especially a school conceived as Girard conceived his [34]—owes its existence to the predominant purpose of education. If equal opportunity is the purpose of the main portion of the statute, then there is obviously special reason to include schools,[35] as the legislature in no uncertain terms has done. To allow the uncertain and general language of the proviso to take a substantial number of private schools out of the coverage of the main subsections would pose a serious threat to the full attainment of the social goals the statute seeks to achieve and would only protect privacy of association in a relatively marginal area. Education is too close to the central purpose of the act and not close enough to the central purpose of the proviso to permit any such reading without a more precise mandate in the wording of the proviso. Compare A. H. Phillips, Inc. v. Walling, 324 U.S. 490, 493, 65 S.Ct. 807, 89 L.Ed. 1095 (1945) The language of the main portion of the statute, which embraces with precision "all educational institutions under the supervision of this Commonwealth," compels the opposite construction.[36]

So viewed, it is also plain that no purposeful distinction can be drawn either between schools that advertise and those that do not, or between schools that make a profit and those that do not. The instant complaint does not allege that Girard advertises or otherwise solicits students or that it makes a profit. Those questions are beside the point. They have nothing to do with the College's purposes or the facilities it affords. It would not further the purpose of either subsections (a) and (c) or (d) to draw the line between schools that may and may not discriminate according to whether or not they solicit patronage or make money. The associational interests of students (or their parents) are not any greater if they attend a school that does not advertise or is a non-profit venture than if they attend one that does or is not.

The *Clover Hill* case did not turn on any such distinction.[37] The court noted

34. In paragraph 21(9) of the will, Girard stated: "My desire is that all the instructors and teachers in the college shall take pains to instil into the minds of the scholars the purest principles of morality, so that, on their entrance into active life, they may, from inclination and habit, evince benevolence towards their fellow creatures, and a love of truth, sobriety and industry, adopting at the same time such religious tenets as their matured reason may enable them to prefer."

Throughout the will, the same concern for thorough moral and intellectual education is evidenced. See, e. g., ¶ 21(7).

35. Cf. Fair Educational Opportunities Act, 24 P.S. § 5002 ("Findings and declaration of policy"): " * * * (b) Equality of educational opportunities requires that students, otherwise qualified, be admitted to educational institutions without regard to race, religion, color, ancestry or national origin."

36. It bears mention that clubs are the only accommodations explicitly mentioned in subsection (d), lending extra support to our reading of what it was that the proviso was designed to protect. The only word in subsection (d) that might suggest an exception for certain kinds of schools is "institution." But when the framers of the statute intended to refer compendiously to schools, they used the phrase "*educational* institutions." "Institution" in subsection (d) was probably intended to cover any possible entity which, though distinctly private within the standards we have enunciated, is not a club. Language being what it is, it is difficult to think of any better general word for such a "thing" than the word "institution."

37. Neither did the *McKaine* case. All the New York court said in *McKaine* was that (no matter how many types of private schools might ultimately be considered public accommodations and not distinctly private enterprises) surely a school like Drake, which solicited public patronage, would have to be among those held to be public accommodations. The court

that Clover Hill made a profit, not because that was in itself dispositive, but because it showed that Clover Hill was not organized to further its members' desires to share the companionship of others like themselves. The facility preceded the "club." Likewise, its advertising and routine admission policies demonstrated that Clover Hill was more a pool than a club. The same was true in Everett v. Harron and Lackey v. Sacoolas, supra.

Another possible distinction which must be rejected, at least in this case, is that between boarding and non-boarding schools. There is closer contact among students at a boarding school, but that does not change its function. Certainly in the case of Girard College the reasons for having the students board-in were to facilitate their thorough and intensified education and alleviate their poverty.[38]

It cannot be emphasized too strongly that the phrasing of the proviso is emphatically narrow. To be exempted by subsection (d), an accommodation would have to be, not just private, not merely distinctly private, but "in its nature"—that is, inherently or intrinsically—distinctly private. For this reason, we find it unnecessary to decide whether the statute contemplated public (and covered) and distinctly private (and excepted) prototypes of the same kind of facility or service. For whether or not there can ever be, for example, a distinctly private ice cream parlor, we have concluded that once some private schools were labelled public accommodations, it is difficult to think of a ground on which other private schools could rationally be categorized as "in their nature distinctly private." [39] Or, to put it more precisely, if there could be a private school which, in view of the scope to be accorded the purposes of the various subsections of the statute, would fall within the proviso, as we read the complaint [40] Girard College does not possess the requisite attributes.

With regard to schools, there is little of the ambivalence that surrounds clubs. As *Clover Hill* shows, there are several varieties of clubs which must be distinguished if the statute is to be implemented effectively. The teaching of *Clover Hill* is that clubs which are organized merely or mainly to take advantage of common facilities have an insufficient associational interest in enforcing their exclusionary preferences to defeat the anti-discriminatory policy of the statute. The burden of this opinion has been to show that schools inevitably partake of the same quality as such clubs: they too, are organized around the facilities they offer—their staffs, curricula and equipment—and their interest in racial exclusion is equally illegitimate under the proviso. Even the most exclusive private school is probably not, in the view of this statute, a social club. We, however, are not called upon

---

did not have before it the question of where, if at all, to draw the line within the category of privately-operated schools.

38. In paragraph 20 of the will, Girard expressed the desire to provide "such a number of poor male white orphan children, as can be trained in one institution, a better education as well as a more comfortable maintenance than they usually receive from the application of the public funds * * *."

39. We are apparently not the first to read the Pennsylvania Public Accommodations Act this way. See Bell v. Maryland, 378 U.S. 226, 284, 84 S.Ct. 1814, 12 L.Ed. 2d 822 (1964) (Appendix V to the opinion of Mr. Justice Douglas); Brief for the United States as Amicus Curiae, pp. 11–

12 n. 10, Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); Cf. Note, 64 Harv.L.Rev. 307, 309–11 (1950). Of course, none of these expressions is binding on us.

40. We assume, with good reason, that when the defendants argued on the motion to dismiss only that the College was within the proviso, they agreed that the matter could be determined from the material in the complaint. While ordinarily the coverage of a proviso is a matter to be pleaded and proved as a defense, the issue in this case is mainly legal, the complaint is ample to decide it, and it would be wasteful to adjudicate the coverage of the various subsections of the statute on a piecemeal basis.

to settle definitively the applicability of the Public Accommodations Act to each and every private school in Pennsylvania. We would not do that even if we could. All we need and do decide now is that—on any fair reading of the statute —Girard College, conceived by its founder as a charitable establishment for training, education and maintenance, see Girard College Trusteeship, 391 Pa. 434, 444, 138 A.2d 844 (1958), appeal dismissed and cert. denied sub nom. Commonwealth of Pennsylvania v. Board of Directors of City Trusts, 357 U.S. 570, 78 S.Ct. 1383, 2 L.Ed.2d 1546 (1958), and presently performing these functions for about 700 orphans, is an educational institution under the supervision of the Commonwealth and is not in its nature distinctly private.

■ It may be pointed out that the Public Accommodations Act is penal, and penal statutes are strictly construed. See, e. g., Commonwealth v. Derstine, 418 Pa. 186, 210 A.2d 266 (1965). But it need hardly be said that this statute embodies objects beyond those contained in the conventional criminal enactment. The Pennsylvania courts explicitly recognized that when they found civil remedies, as well as criminal penalties, embedded in the statute.

■ The maxim of strict construction reflects notions of fair warning to potential criminal violators. See United States v. Standard Oil Co., 384 U.S. 224, 234–236, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966) (Harlan, J., dissenting); HALL, STRICT OR LIBERAL CONSTRUCTION OF PENAL STATUTES, 48 Harv.L.Rev. 748, 765–66 (1935). It is a cognate of the constitutional pro-

hibition of vagueness in criminal statutes. Cf. Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939). It does not give *carte blanche* to ignore legislative intent. United States v. Cook, 384 U.S. 257, 262–263, 86 S.Ct. 1412, 16 L.Ed.2d 516 (1966); Commonwealth v. Shafer, 414 Pa. 613, 620, 202 A.2d 308 (1964).

■ This is an injunction action, not a criminal prosecution. Even a statute too ambiguous on its face to sustain a criminal prosecution may still be definite enough to support an injunction, which operates prospectively only. The Commonwealth has been cautious in bringing prosecutions under the Public Accommodations Act, and it would be allowing imagination to dictate to judgment to interpret the act more narrowly than intended when there is no immediate prospect of punishing criminally a violator who, lacking expertise in the art of construction, had misread it.[41]

Short of that prospect or some real doubt about the statute's applicability or a serious constitutional question arising from the statute,[42] it is impossible to find that the legislature, in formulating a rational and effective anti-discrimination policy, must have intended the very opposite of what the evidence overwhelmingly demonstrates it did intend. What Mr. Justice Cardozo wrote for a unanimous Supreme Court in a very different context is equally fitting here:

" * * * 'The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed.' Its intimation is clear enough in the stat-

---

**41.** As to violations subsequent to a decision holding the statute applicable to private schools, cf. Bouie v. City of Columbia, 378 U.S. 347, 353–354, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964).

**42.** No such question is possible with respect to this legislation. See District of Columbia v. John R. Thompson Co., 346 U.S. 100, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953); Railway Mail Ass'n v. Corsi, 326 U.S. 88, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945); Western Turf Ass'n v. Green-

berg, 204 U.S. 359, 27 S.Ct. 384, 51 L.Ed. 520 (1907); and the state cases, which are legion. Cf. Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). Defendants have not raised any constitutional issues, and any assertion of unconstitutionality, had it been made, would have been "devoid of constitutional substance." Railway Mail Ass'n v. Corsi, supra, 326 U.S. at 98, 65 S.Ct. 1483 (Frankfurter, J., concurring).

utes now before us that their effects shall not be stifled, without the warrant of clear necessity, by the perpetuation of a policy which now has had its day." Van Beeck v. Sabine Towing Co., 300 U.S. 342, 351, 57 S.Ct. 452, 456, 81 L.Ed. 685 (1937).

 Only a word need be said about what this interpretation does and does not do. It does not mean that a testator or settlor may not leave his property as he sees fit. It does mean that dispositions by will or trust must comply with applicable laws extant when the disposition was made and with laws which the legislature may later enact. "If the owner of property transfers it in trust and it is provided that the trustee shall do an act which at the time of the creation of the trust is legal, but which owing to a change of law or owing to a change of circumstances becomes illegal, the provision becomes unenforceable." REST. TRUSTS 2d, § 61, comment b (1959). And it has long been established in Pennsylvania, as elsewhere, that provisions in wills or trusts which contravene statutes or public policies are unenforceable. Scholler Estate, 403 Pa. 97, 169 A.2d 554 (1961); Wanamaker's Estate, 335 Pa. 241, 6 A.2d 852 (1939); Devlin's Trust Estate, 284 Pa. 11, 130 A. 238 (1925); Manners v. Philadelphia Library Co., 93 Pa. 165 (1880); Greenfield's Estate, 14 Pa. 489 (1851); 1 SCOTT, TRUSTS §§ 60–62 (2d ed.1956); see also 2 id. § 166; 4 id. § 377; REST. TRUSTS 2d §§ 60–62, 166, 377 (1959). This statute forbids discrimination in schools such as Girard. Accordingly, if the individual plaintiffs can prove count three of their complaint, continued racial discrimination in the selection of students for admission to Girard College will be enjoined. Everett v. Harron, supra; Lackey v. Sacoolas, supra.

We have approached the task of construction with great circumspection and humility, mindful that in the federal system the state courts are the primary expositors of state law. Deference to the state courts on an important issue of state law might otherwise have been proper. Invocation of the abstention doctrine, however, requires "special circumstances." Baggett v. Bullitt, 377 U.S. 360, 375, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). At the least it requires a state law matter which is not only unresolved but difficult of resolution and susceptible of varying results. It is not properly used when the question becomes, not what the meaning of the state law is, as applied to the case at bar, but only who should declare it. After exhaustive research and thought, it is our view that the chances of displacement of the application we have given the act by subsequent decisions of the Pennsylvania courts are minimal. Not one other state court has interpreted the statute to exempt private schools from its coverage without being overruled by a higher court or a legislature.[43] We can find no reason to anticipate perversity in Pennsylvania.

## VIII. THE DISPOSITION OF THE MOTION TO DISMISS THE COMPLAINT

 Since count three states a claim on which relief can be granted, this litigation must proceed. But in its present posture, there is no need to go on to consider whether counts one and two also state valid claims. The primary function of a motion to dismiss is to screen claims for insufficiency. If the individual plaintiffs can prove their claims under count three, then there will never be occasion in this lawsuit to decide the difficult questions underlying the other counts. If it does become necessary to reach them, they can be treated at or after trial. In the interest, therefore, of avoiding the unnecessary decision of sensitive constitutional and testamentary issues, decision on the merits of counts one and two will be deferred, and the motion to dismiss them at this time will be denied. Ample authority exists for the exercise of this discretion.

---

**43.** See note 32, supra.

Gibbs v. Buck, 307 U.S. 66, 76, 59 S.Ct. 725, 83 L.Ed. 1111 (1939); Fong v. United States, 300 F.2d 400 (C.A. 9, 1962), cert. denied, 370 U.S. 938, 82 S.Ct. 1584, 8 L.Ed.2d 807 (1962); 2 MOORE, FEDERAL PRACTICE ¶ 12.16 (1965). See also F.R.Civ.P. 12(a); Rothberg v. National Banner Corp., C.A. No. 38541, E.D.Pa., Apr. 11, 1966, p. 5; Miller v. Bargain City, U.S.A., Inc., 229 F.Supp. 33, 36 (E.D.Pa., 1964).

So far as count one is concerned, the issues of nonobvious state involvement are probably the kind that courts are rightly reluctant to decide on a motion to dismiss anyway. See Gibbs v. Buck, 307 U.S. 66, 76, 59 S.Ct. 725, 83 L.Ed. 1111 (1939); Polk Co. v. Glover, 305 U.S. 5, 10, 59 S.Ct. 15, 83 L.Ed. 6 (1938); Borden's Farm Prods. Co. v. Baldwin, 293 U.S. 194, 211–213, 55 S.Ct. 187, 79 L.Ed. 281 (1934); Gibbs v. Blackwell, 354 F.2d 469, 471 (C.A. 5, 1965). Cf. Dispatch, Inc. v. City of Erie, 364 F.2d 539 (C.A. 3, 1966). They require concrete development to evaluate properly by the process of "sifting facts and weighing circumstances." Burton v. Wilmington Parking Auth., 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed. 2d 45 (1961).[44] Likewise, a decision on the *cy pres* and will construction questions of count two would no doubt be far more enlightened if preceded by proof of the precise nature and extent of the alleged prior deviations from the will and the changed circumstances on which plaintiffs rely.

For all of the stated reasons, the defendants' motion to dismiss the complaint will be denied as to counts one and two, without prejudice to the rights of the defendants to renew it at the appropriate time. The motion to dismiss will be granted as to count three insofar as the Commonwealth of Pennsylvania, the Attorney General of Pennsylvania, and the City of Philadelphia are parties-plaintiff. The motion to dismiss will

be denied as to count three insofar as the seven individuals are parties-plaintiff. If there are disputed issues of fact as to count three, the defendants are granted leave to answer the entire complaint within twenty (20) days. Cf. F.R.Civ.P. 12(a). It is so ordered.

---

44. In *Burton,* the Court remarked that the "trial court's disposal of the issues on summary judgment * * * resulted in a rather incomplete record" on which to decide them. 365 U.S. at 722, 81 S.Ct. at 860.